UNITED STATES of America

v.

David C. FAULKINGHAM, Defendant

No. 01–CR–04–B–S.

United States District Court,
D. Maine.

Aug. 24, 2001.

Timothy D. Wing, Asst U.S. Atty., Daniel J. Perry, U.S. Attorney's Office, Bangor, ME, for U.S.

Kevin Barron, Seal Harbor, ME, for Defendant.

## ORDER MODIFYING RECOMMENDED DECISION

SINGAL, District Judge.

Before the Court is Defendant's Motion to Suppress (Docket # 30). The Magistrate Judge held an evidentiary hearing and oral argument on Defendant's Motion and recommended that the Motion be granted in part and denied in part. (*See* Magistrate Judge's Recommended Decision on Defendant's Motion to Suppress (Docket # 37).)

In accordance with its de novo review of the Magistrate Judge's recommendations, the Court initially noted some apparent disagreement between the Recommended Decision and a subsequently released decision in *United States v. Kruger*, 151 F.Supp.2d 86 (D.Me.2001). While the Recommended Decision concluded that the fruit of the poisonous tree doctrine did not apply to a *Miranda* violation, in *Kruger* Judge Carter concluded that the fruit of the poisonous tree doctrine could be applied to suppress physical evidence found as the result of a *Miranda* violation. Hoping to reconcile these divergent opinions, the Court ordered supplemental briefing on July 5, 2001. (*See* Docket # 45.) The Court has now had an opportunity to consider these supplemental briefs as well as all of the other objections raised by Defendant.

Having reviewed and considered the Magistrate Judge's Recommended Decision and Defendant's objections thereto, together with the entire record, the Court has made a de novo determination of all matters adjudicated by the Magistrate Judge's Recommended Decision. The Court concurs with the Magistrate's recommended factual findings as well as the recommended legal conclusions, with the exception of the "fruit of the poisonous tree" issue upon which the Court ordered supplemental briefing.

As a result of a clear *Miranda* violation, the Magistrate recommended suppression of statements made by Defendant before he was informed of his *Miranda* rights. However, she also recommended that the Court not apply the fruit of the poisonous tree doctrine to this *Miranda* violation thereby denying Defendant's Motion to the extent it sought to suppress derivative evidence that included both physical evidence and third party testimonial evidence. For the reasons stated below, the Court finds this derivative evidence is tainted by the *Miranda* violation in this case and cannot be purged of that taint. Therefore, the Court hereby modifies the Recommended Decision and suppresses the physical and testimonial evidence obtained as a result of Defendant's pre-*Miranda* statements.

## I. FINDINGS OF FACT

Along with his co-defendants, Mark Power and Brennan Spofford, Defendant David Faulkingham is charged with one count of possession of heroin with intent to distribute and one count of conspiracy to distribute heroin. An evidentiary hearing on Defendant Faulkingham's Motion to Suppress was held before the Magistrate Judge on May 11, 2001. Having reviewed the transcript, the Court concurs completely with the Magistrate's recommended findings of fact. Thus, rather than reinvent the wheel, the Court below recites the relevant facts verbatim from the Recommended Decision (Docket # 37):

Shortly before August 1, 2000, Agent Mark Leonard of the Maine Drug Enforcement Agency ("MDEA") received information from a known confidential informant that David Faulkingham was a drug user/dealer in the Hancock County, Maine area. Agent Leonard was also informed that Faulkingham lived in Tremont, Maine, and that he drove a tan Lincoln Town Car. Neither Agent Leonard nor the other agent involved in this case, Robert Hutchings, had heard of or met David Faulkingham prior to receiving this information. Nevertheless, they determined that it would be worthwhile to investigate the situation and on August 1 decided to travel from Bangor to Tremont to see what was what.

Prior to going to the Tremont area, they stopped at the Hancock County Jail in Ellsworth, Maine, and spoke with Deputy Sheriff Stephen MacFarland.

The agents were provided with a jail photograph from approximately 1996 that showed Faulkingham's appearance at that time. They learned that Faulkingham had lost considerable weight since the date of the photograph. Agent Leonard also did some background investigation and learned that Faulkingham's right to operate a motor vehicle was under suspension. He verified the continuing suspension with the Department of Motor Vehicles while on route to Tremont.

At approximately 3:00 p.m., the agents arrived in the vicinity of the Tremont residence that had been identified to them as Faulkingham's. They drove by the residence and saw a small black vehicle sitting in the driveway with a passenger in it. The driver was not immediately visible nor was the tan Lincoln. The agents drove on and turned around to make another pass by the house. As they did so, they observed two individuals approximately three to four hundred yards from the residence standing in a woods road. The agents parked their vehicle in another woods road closer to the residence where they were able to maintain visual contact with the residence but could not be seen by others. By this time, the Lincoln was in the driveway parked beside the black car.

The black car left the driveway shortly thereafter and the agents followed it for a short way down the road. As the car approached the second woods road where the two individuals had been standing, the black car stopped dead in the middle of the road. The two individuals ran into the road and jumped into the black car. The agents followed the car for a short way and then turned around and returned to their surveillance point. The Lincoln was still in the driveway. At this point in time, Agent

Hutchings had a suspicion that illegal drug activity might have just occurred.

At about 3:15 p.m. the Lincoln left the driveway. The agents were able to ascertain that the driver appeared to be a male and that there were two passengers in the vehicle. They could make no further identification at that point. They followed the vehicle for approximately two miles until it started to travel onto the Flat Iron Road. The Flat Iron Road merges with the route they were traveling on, and as the Lincoln entered the intersection the driver slowed and made a type of u-turn so that his car was now facing back in the direction from which it had just come. As the agents' car was directly behind the Lincoln at that point, the vehicles passed driver's side window to driver's side window at an extremely slow speed. In fact, the defendant's vehicle was not moving. Agent Hutchings immediately recognized that the operator of the vehicle matched the photograph of Faulkingham that the agents had clipped onto their sun visor when they left the Hancock County Jail.

Hutchings immediately pulled his vehicle to the side of the road, jumped from his vehicle, and identified himself verbally and by showing his badge to the operator. Hutchings asked Faulkingham to identify himself and when he confirmed that he was David Faulkingham, Hutchings placed him under arrest for operating after suspension. During the patdown search Hutchings found heroin, hashish, and a syringe on Faulkingham's person. Hutchings placed Faulkingham in handcuffs and put him in the back seat of the agents' car.

In the meantime, Agent Leonard was dealing with the two passengers. He obtained identification from them and checked to see if either was wanted for

any law enforcement purposes. Finding no reason to hold either of them, he fairly quickly told them they could leave the area, which they did on foot. Leonard then proceeded to search the motor vehicle as part of this traffic stop but did not find anything of further interest for purposes of this case.

While Leonard was dealing with the passengers and the motor vehicle, Hutchings put the evidence seized from Faulkingham's person into his trunk and then returned to the passenger compartment of the vehicle, ostensibly to "complete some paperwork." Included among that paperwork is a form which is used to advise suspects in custody of their rights under the *Miranda* rule. Hutchings understood that he had a suspect in custody that he intended to interrogate, but he never read the *Miranda* warning.

Once Hutchings took a seat in the vehicle and explained to Faulkingham that he was planning to review some paperwork with him, Faulkingham announced to him that he was a heroin addict and that within the next two hours he was going to go into withdrawal. At that point, however, Faulkingham appeared normal and spoke without difficulty. After learning of Faulkingham's concerns regarding his addiction, the agents informed him that he could either cooperate with them and provide information concerning his supplier or he would be taken to the Hancock County Jail for processing. Faulkingham then informed them that if he were going to cooperate, time was of the essence because one of the fellows who had just departed was a roommate of his supplier. Once the supplier learned that Faulkingham had been apprehended by the police, obtaining evidence against him would become more difficult. Faulkingham suggested to the agents

that his supplier was a major drug dealer and that his apartment currently contained a huge quantity of heroin that Faulkingham had seen the previous day. The agents were lead to believe that this operation could be a "huge bust." They maintain that in the excitement of the moment they simply didn't have time to comply with *Miranda*. Faulkingham asked them what sort of deal they could give him and the agents responded that they could not make any deals or promises, but they confirmed that his cooperation would make it easier for him.

At about this point in time Shannon Faulkingham, the defendant's wife, arrived at the scene in her pick up truck. On her way to the post office she observed her husband's vehicle pulled over to the side of the road. When she learned what was happening she became upset and started to cry, revealing to the agents that she had just gotten her husband through a drug rehabilitation program and that she thought he had overcome the problem. Faulkingham talked with his wife and asked her to call Kevin Barron, his attorney, and make arrangements for his bail. The agents agreed that Faulkingham asked his wife to call someone and that he was concerned about bail money because they had seized cash from his person. However, they deny that they specifically heard Faulkingham say that he wanted to call his attorney. In fact, they agree that he mentioned to them that he had retained an attorney, but did not express a desire to speak with the attorney. The agents also agree that in spite of this passing reference to a retained attorney, neither agent proceeded to provide the *Miranda* warning.

After his wife left the area, Faulkingham reiterated his concern that if he were going to cooperate it was impera-

tive that they move quickly, indicating that he should place the call to Mark Power, his supplier, by 3:30 p.m. or it was likely that Power would take steps to destroy or conceal the drugs in his apartment because he would have learned of Faulkingham's arrest. When Faulkingham made this suggestion Hutchings looked at his watch and observed that it was 3:28 p.m. Faulkingham also expressed to the agents his concern about being seen in the intersection by passing motorists and offered that the best place to make the call would be from his own residence due to Power's routine use of caller ID to screen his calls. The agents called their supervisor and obtained permission to proceed with Faulkingham, but they balked at going to his house as contrary to standard police procedures. Therefore Faulkingham suggested a secluded marina as a secondary location. Hutchings drove Faulkingham there in the police vehicle and Leonard followed driving the Lincoln. Faulkingham's handcuffs were removed and he was given access to a telephone.

During this time period the agents opined that Faulkingham was driving the investigation and that they had basically put him in charge. His plan was to convince his supplier, Mark Power, to come over to his residence and perhaps bring the drugs with him. Although Faulkingham made repeated attempts to call Power from the marina location, he was not able to make contact. Faulkingham insisted that they should return to his residence in order for him to be able to make the call from his own phone. Finally, at about 4:30 p.m., the three men returned to Faulkingham's residence.

Once inside the residence, Faulkingham was able to make two recorded phone calls to Power's apartment. On one occasion he spoke to a roommate named Dave who assured him that the "stuff" was safe. Eventually Faulkingham talked directly to Power and convinced him to come over to the house. When Power came over to the residence at approximately 5:00 p.m. he was confronted by the agents and he too agreed to cooperate, becoming the Government's primary witness in this case against Faulkingham, who Power contends was the actual supplier of the drugs. Once Hutchings and Leonard became involved with Power that evening they had little additional contact with Faulkingham. However, from the scant evidence they did present it is clear that Faulkingham became ill at his residence, apparently spending time in the bathroom vomiting. The supervisor, Arno, arrived at the scene and apparently tended to Faulkingham, eventually taking him to a local hospital for treatment for his withdrawal symptoms. Hutchings and Leonard both acknowledged that they knew that heroin addicts who go into withdrawal can become extremely ill and miserable. They also acknowledge that from the moment they placed Faulkingham in custody they never advised him of his rights and they made clear to him that if he did not cooperate with them he would go immediately to jail where the jail authorities would have to deal with his withdrawal symptoms in accordance with jail policy. The alternative they presented to him was that if he cooperated he would not be arrested that evening. Furthermore, immediately upon his indication that he might cooperate by making phone calls, the agents removed his handcuffs and allowed him to "call the shots." Ultimately, they neither arrested Faulkingham nor gave him a summons that night.

(Recommended Decision at 1–7 (Docket # 37).)

## II. DISCUSSION

On the facts presented, the Government conceded that Defendant was subject to the functional equivalent of express questioning without being advised of his *Miranda* rights. *See Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Thus, the Recommended Decision properly held that the Government could not introduce Defendant's unwarned statements during its case in chief. However, in light of the manner in which the Government's case against Faulkingham developed, the Government's strongest evidence is not Faulkingham's unwarned statements but rather the evidence derived from those statements, including the testimonial evidence of co-defendant Mark Power. Thus, the difficult question presented by Defendant's Motion is: whether the Court should also suppress this derivative evidence obtained as a result of the *Miranda* violation. Answering this question, requires the Court to embark on a survey of the legal landscape relating to *Miranda* and the fruit of the poisonous tree doctrine.

### A. *Miranda* and the Fifth Amendment Privilege Against Self–Incrimination

#### 1. The Current Legal Landscape

■ The Fifth Amendment privilege against self-incrimination "protects against any disclosures which [a] witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar v. United States,* 406 U.S. 441, 445, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). According to the Supreme Court, the privilege "serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." *Miranda v. Arizona,* 384 U.S. 436, 467, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Given the inherently coercive nature of custodial interrogation, the *Miranda* Court concluded that "[u]nless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." *Id.* at 458, 86 S.Ct. 1602.

More specifically, the *Miranda* Court went on to outline a protective procedure for warning individuals of their basic rights prior to custodial interrogation. *See id.* at 467–471, 86 S.Ct. 1602. At the same time, the Supreme Court also suggested that alternative protective devices might be developed through the legislative process. *See id.* at 467, 86 S.Ct. 1602. However, in the absence of any adequate legislative innovation, the Court endorsed what has come to be known as "the *Miranda* warning." *See id.* at 468–73, 86 S.Ct. 1602. The *Miranda* Court also required the government to carry the burden of demonstrating "that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel" if the government sought to introduce a statement obtained from a defendant during a custodial interrogation without an attorney present. *Id.* at 475, 86 S.Ct. 1602.

More recently, in *Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), the Supreme Court clarified that its *Miranda* decision was, in fact, "a constitutional decision." *Id.* at 438, 86 S.Ct. 1602. *See also United States v. Melendez,* 228 F.3d 19, 21–22 (discussing the *Dickerson* decision). The Court explained that although its 1966 decision did not conclude that the Constitution "require[d] police to administer the particular *Miranda* warnings," the *Miranda* decision

did hold that the Constitution "require[d] a procedure that is effective in securing Fifth Amendment rights." *Dickerson,* 530 U.S. at 440, 120 S.Ct. 2326.

### 2. The *Miranda* Violation in this Case

 In this case, the police did not attempt to utilize any procedure to secure Faulkingham's Fifth Amendment rights. Rather, while he was in the back of the agents' car in handcuffs, Faulkingham voluntarily announced to Agent Hutchings that he would begin suffering the symptoms of heroin withdrawal within about two hours. With this information in hand and Faulkingham in handcuffs, the agents advised Faulkingham that he could either cooperate or be taken to Hancock County Jail for processing. It was made clear to Faulkingham that if he cooperated, he would not be arrested that evening. Additionally, the agents had assured Faulkingham that they would get him medical attention if and when he started to exhibit symptoms of heroin withdrawal. Faced with this choice in light of his soon-to-be deteriorating physical condition, Faulkingham chose to cooperate. As a result, he spent the next two hours with the agents making incriminating statements and leading the agents to discover what would turn out to be even more incriminating evidence. Essentially, Faulkingham was "put in charge" of the investigation without knowingly and intelligently waiving his privilege against self-incrimination or his right to his retained counsel.[1]

Although the agents testified that they did not have time to comply with *Miranda,* the Court is skeptical that over the course of more than two hours the agents had no time to advise Defendant of his fundamental rights.[2] In short, the agents' failure to give Faulkingham a *Miranda* warning was negligent, at best. Moreover, considering the nature of the interrogation, the complete lack of any protective device, along with Defendant's impending heroin withdrawal, it is difficult to conclude that Defendant's cooperation was truly the product of his free choice. *See Miranda,* 384 U.S. at 458, 86 S.Ct. 1602 (explaining that "[u]nless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice."). *But see United States v. Byram,* 145 F.3d 405, 407 (1st Cir.1998) (explaining that "only confessions procured by coercive official tactics [along with evidence derived from such confessions] should be excluded" and that " '[f]ree choice' is no longer a touchstone").

### B. The Fruit of the Poisonous Tree Doctrine

In light of the *Miranda* violation discussed above, the question is: what is the extent of Defendant's exclusionary remedy? While the Government maintains that

---

1. At the suppression hearing, Agent Leonard testified that in the context of discussing with Faulkingham whether he would be able to cut a deal, Faulkingham said something "to the effect of—that he would trust that we weren't going to fuck him over, and he would—he wanted to cooperate and provide us with his source of supply." (Tr. p. 84, ll. 14–22 (Docket # 41).) This statement by Faulkingham strongly suggests that he did not understand that anything he said could and would be used against him in a court of law. Yet at

no time prior to or after this statement by Faulkingham did the agents give him a *Miranda* warning.

2. At the suppression hearing, Agent Hutchings testified on cross-examination that reading the *Miranda* warning takes ten seconds. (Tr. p. 69, ll.13–18.) Agent Leonard estimated that reading the *Miranda* form takes between one to four minutes. (Tr. p. 94, ll.8–12.)

only Faulkingham's own unwarned statements should be excluded, Defendant argues that the taint of the *Miranda* violation extends to the "fruit" or derivative evidence obtained as a result of his unwarned statements. Thus, Defendant invites the Court to apply the fruit of the poisonous tree doctrine to the facts presented.

In explaining the fruits doctrine in the context of the Fourth Amendment, the Supreme Court explained that the relevant inquiry is "'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (quoting Maguire, Evidence of Guilt, 221 (1959).) In *Wong Sun,* the Court concluded that the arrest of one of the defendants, Toy, violated the Fourth Amendment. In accordance with the fruit of the poisonous tree doctrine, the Court then excluded derivative evidence from the case against Toy, including statements made by Toy at the time of his arrest, as well as narcotics obtained from a third party as a result of Toy's statements.[3] *See id.* at 484–488, 83 S.Ct. 407. Although the fruit of the poisonous tree doctrine has been crafted in the context of the Fourth Amendment, the Supreme Court has acknowledged that the fruits doctrine can be applied to violations of the Fifth and Sixth Amendments. *See Nix v. Williams,* 467

U.S. 431, 442, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

■ Although the fruits doctrine may be applicable to the Fifth Amendment, derivative evidence obtained in violation of *Miranda* has generally not been excluded unless the defendant's unwarned statements were found to be "involuntary." *See Byram,* 145 F.3d at 407–08 (explaining the voluntariness concept). As the Magistrate Judge explained in the Recommended Decision, coercive police activity is a prerequisite to finding that a defendant's statements are involuntary. (*See* Recommended Decision at 15–16.) Thus, only upon a finding of coercive police activity or "coercive official tactics" can a court proceed to consider the totality of the circumstances to determine whether a defendant's statements were voluntary. *Byram,* 145 F.3d at 407–08 (discussing the narrow definition of coercion endorsed by *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).).

On the record, the preponderance of the evidence does not suggest the use of "coercive official tactics." Rather, the Court believes that Faulkingham's statements were coerced by the lack of a *Miranda* warning, rather than by any of the narrowly defined "official coercive tactics." In short, the Court does not disagree with the Magistrate's finding that Faulkingham's statements were voluntary.[4] (*See* Recommended Decision at 15–16 (Docket # 37).)

The Supreme Court's recent decision in *Dickerson* has raised new questions regarding when and how the fruits doctrine

---

**3.** In *Wong Sun,* the Supreme Court noted that although the Fourth Amendment exclusionary rule traditionally sought to protect "tangible fruits" (i.e. physical evidence), it saw no reason to distinguish testimonial or verbal evidence that was obtained through similar means. *See Wong Sun,* 371 U.S. at 485–86, 83 S.Ct. 407.

**4.** However, the Court notes that the voluntariness issue would be a close call if the agent's negligent failure to provide Faulkingham with a *Miranda* warning could overcome the "coercive official tactics" prerequisite.

could be applied to *Miranda* violations. In this case, the Magistrate Judge, relying on two pre-*Dickerson* Supreme Court decisions, *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974) and *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), "recommend[ed] that the Court not graft the 'fruit of the poisonous tree' onto the *Miranda* exclusionary rule." (Recommended Decision at 13 (Docket # 37).) However, in accordance with its de novo review, the Court finds that both *Tucker* and *Elstad* are distinguishable from this case.

### 1. *Michigan v. Tucker*

In *Tucker*, the defendant sought to suppress the incriminating testimony of a man he had named as an alibi witness during a custodial interrogation. Prior to the interrogation, the defendant was asked "whether he knew for what crime he had been arrested, whether he wanted an attorney, and whether he understood his constitutional rights." *Id.* at 436, 94 S.Ct. 2357. The defendant was also advised that "any statements he might make could be used against him." *Id.* Thus, the *"Miranda* problem" present in *Tucker* was simply that police had failed to advise Tucker of his right to appointed counsel even if he could not afford to retain an attorney.

However, the interrogation in *Tucker* had actually taken place prior to the Court's issuance of the *Miranda* opinion. *Id.* at 447, 86 S.Ct. 1602. In light of what the Court perceived as a good faith effort to advise Tucker of his rights in the absence of *Miranda*'s guidance, the Court found that excluding the evidence obtained as a result of the interrogation would not serve the deterrent purpose that stood behind the exclusionary rule. *See id.* at 447–48, 86 S.Ct. 1602. By comparison, the Supreme Court noted that the deterrent purpose of the exclusionary rule is served

when "police have engaged in willful, or at the very least negligent, conduct." *Id.* at 447, 86 S.Ct. 1602. Ultimately, on the facts presented, the majority in *Tucker* concluded that "the police conduct at issue . . . did not abridge [Tucker]'s constitutional privilege against compulsory self-incrimination, but departed only from the prophylactic standards later laid down . . . in *Miranda* to safeguard the privilege." *Id.* at 445–46, 86 S.Ct. 1602.

The First Circuit has previously recognized the limited holding of *Tucker* in *United States v. Downing*, 665 F.2d 404 (1st Cir.1981). In *Downing*, the defendant had been advised of his *Miranda* rights and invoked his right to have counsel during his custodial interrogation. *See id.* at 405. Nonetheless, defendant was subject to interrogation without counsel present during which time he made incriminating statements. The First Circuit upheld the suppression of the defendant's statements as well as tangible evidence uncovered as a result of the statements. *See id.* at 409. Although the Government attempted to invoke *Tucker* as grounds for not applying the Fifth Amendment exclusionary rule to derivative evidence obtained as a result of the defendant's statements, the First Circuit construed *Tucker* narrowly. As in *Downing*, the Court is satisfied that the facts presented in this case do not fit within *Tucker*.

### 2. *Oregon v. Elstad*

Approximately five years after the First Circuit had applied the fruit of the poisonous tree doctrine to a Fifth Amendment violation in *Downing*, the Supreme Court handed down its decision in *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). *Elstad*, unlike *Tucker*, involved an interrogation that took place after the *Miranda* decision was issued. More specifically, Elstad made an

incriminating oral statement in response to a police question prior to being advised of his *Miranda* rights. He was subsequently advised of his rights at the police station and then proceeded to give a signed written confession. Elstad argued that this written confession should be suppressed as the fruit of his pre-*Miranda* oral statement. Ultimately, the majority in *Elstad* held that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Elstad*, 470 U.S. at 318, 105 S.Ct. 1285.

To the extent that *Elstad* suggested that *Miranda* was a prophylactic decision, rather than a constitutional one, *Elstad* has clearly been replaced by the Court's recent clarification in *Dickerson See Elstad*, 470 U.S. at 309, 105 S.Ct. 1285 ("If errors are made by law enforcement officers in administering the prophylactic Miranda procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself.") However, *Elstad*, which the *Dickerson* majority opinion characterizes as "refusing to apply the traditional 'fruits' doctrine developed in Fourth Amendment cases," otherwise remains a piece of the Fifth Amendment exclusionary rule puzzle. *Dickerson*, 530 U.S. at 441, 120 S.Ct. 2326 (explaining that the decision in *Elstad* "recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment").[5] The Government maintains that *Elstad* controls this case and cites cases showing that

courts have construed *Elstad* as a "sweeping rejection of the fruit of the poisonous tree doctrine as applied to *Miranda* violations." W. LaFave et al., 3 Criminal Procedure § 9 .5(a) at 386 (1999). *See, e.g., United States v. Bin Laden*, 126 F.Supp.2d 264, 268 & n. 4 (S.D.N.Y.2000).

Despite this generally broad reading of *Elstad*, the First Circuit has said "that *Elstad* does not wholly bar the door to excluding evidence derived from a *Miranda* violation." *Byram*, 145 F.3d at 409–10. However, the First Circuit has also acknowledged "that *Elstad* discourages any promiscuous use of the fruits doctrine in ordinary *Miranda* cases." *Id.* at 410. More specifically, the *Byram* decision lists three criteria to be met prior to the application of the fruits doctrine for a *Miranda* violation. *See id.* First, the *Miranda* violation should be "not merely technical." *Id.* Second, there should be "a substantial nexus between the violation and the second statement." *Id.* Third, it is important that "the second statement is not itself preceded by an adequate *Miranda* warning." *Id.*

The fact of the *Byram* case were admittedly "unusual" and, thus, are not easily summarized. *Id.* The First Circuit found that the defendant had not been advised of his *Miranda* rights prior to a custodial interrogation on a state murder case. *See id.* at 409. During the interrogation, Byram admitted to handling a firearm. As a result of this interrogation, Byram was called as a witness in the state murder case. At the state trial, he again made unwarned incriminating statements about

---

**5.** Because the Supreme Court did not further elaborate on the relevant difference between the Fourth and Fifth Amendment violations, it is difficult to determine if these differences are relevant to this case. To the extent that both the *Miranda* warning and the fruits doctrine seek to deter constitutional violations by law enforcement, the Court assumes that despite the differences in the Fourth and Fifth Amendments, violations of an individual's rights under either the Fourth or Fifth Amendment are equally repugnant and should be similarly deterred.

handling a firearm. *See id.* at 406–07. The Government sought to introduce this state trial testimony in its federal case against Byram for being a felon in possession of a firearm. Applying the three criteria listed above, the First Circuit excluded the state trial testimony as derivative "fruits" of a substantial *Miranda* violation. *See id.*

### 3. *United States v. Kruger*

*Byram* is not the only decision within the First Circuit to find that the fruits doctrine could be appropriately applied to suppress evidence obtained in violation of *Miranda.* Very recently, another court within this District found that a Fifth Amendment violation warranted the application of the fruits doctrine in *United States v. Kruger*, 151 F.Supp.2d 86 (D.Me. 2001). Finding that *Dickerson* "changed the landscape," the court in *Kruger* found that a *Miranda* violation was, in fact, a constitutional violation. *Id.* at 101. Thus, the court reasoned that the fruits doctrine applied and tangible evidence obtained as a direct result of Kruger's unwarned statement should be suppressed. *See id.* Alternatively, the Court noted that the deterrence rationale of the fruits doctrine required suppression in the *Kruger* case and that the factors laid out in *Byram* also supported suppression of the derivative evidence in Kruger's case. *See id.* at 102.

### 4. Application of the Existing Precedent to Faulkingham

Although the court in *Kruger* found that *Dickerson* had "changed the landscape," it is perhaps more appropriate to say that *Dickerson* lifted the dense fog that had settled into the landscape in the thirty years following the Supreme Court's watershed decision in *Miranda. Id.* at 102. However, with the fog lifted, it is still difficult to find the trail created by the existing precedent.

To the extent that the *Kruger* decision cuts a clear trail through the use of a logical "direct analytic construct," the Court believes that the facts of *Faulkingham* fall squarely within this construct thereby justifying exclusion of the derivative evidence obtained in violation of *Miranda. Id.* at 102. However, the Court is reluctant to take this *Kruger* trail, because it appears to invite widespread application of the fruits doctrine in cases of *Miranda* violations. To the extent that *Elstad* remains good law after *Dickerson, Elstad* does not appear to tolerate widespread use of the fruits doctrine in the context of *Miranda. See Dickerson,* 530 U.S. at 441, 120 S.Ct. 2326; *Elstad,* 470 U.S. at 307–10, 105 S.Ct. 1285; *Byram,* 145 F.3d at 410.

Moreover, under the facts presented, the Court need not adopt a per se application of the fruits doctrine to *Miranda* violation to justify excluding the derivative evidence in this case. Rather, the facts of this case present a substantial *Miranda* violation under unique circumstances. Although this case does not fit squarely within the confines of the three factors laid out by the First Circuit in *Byram,* the Court attempts to apply the *Byram* factors below.

### a. Type of *Miranda* Violation

In *Byram,* the First Circuit distinguished both *Elstad* and *Tucker* from the case presented because in *Byram* "the original *Miranda* violation was not technical." *Byram,* 145 F.3d at 410. Rather, during the initial interrogation, *Byram* was never provided with his *Miranda* rights in any form. *See id.* at 406. Quite similarly, *Faulkingham* was never read his *Miranda* rights at any point, although he spent more than two hours talking with the agents. Under the facts presented,

this *Miranda* violation was substantial and resulted in Faulkingham failing to knowingly and intelligently understand that he was waiving his privilege against self-incrimination.

### b. Substantial Nexus

The First Circuit in *Byram* also found "a substantial nexus" between the initial *Miranda* violation and the derivative evidence obtained, which in the case of *Byram* was his second incriminating statement in open court. *See Byram*, 145 F.3d at 410. In this case, the derivative evidence is of a different nature—testimony by a third party and drugs received from the same third party. However, the Government has conceded that all of the derivative evidence it seeks to use against Faulkingham was obtained through Faulkingham's unwarned statements. (*See* Tr. p. 101, ll. 5–23.) Under these circumstances, it is hard to say that there is anything but a substantial nexus between the *Miranda* violation and the derivative evidence. Faulkingham's failure to be notified that his statements and evidence obtained as a result of those statements could and would be used against him substantially facilitated the Government's collection of evidence.

The Court notes that in terms of the nature of the derivative evidence obtained from Faulkingham's unwarned statements, the present case is most analogous to *Wong Sun*, where the defendant Toy, upon being subjected to an unlawful arrest, implicated a third party, Yee, who surrendered an ounce of heroin he allegedly received from Toy. *See Wong Sun*, 371 U.S. at 487–88, 83 S.Ct. 407. The *Wong Sun* Court excluded the drugs in the Government's case against Toy finding they were obtained by exploiting a Fourth Amendment violation. In this case, Faulkingham's unwarned statements implicated

Power, who, in turn, led authorities to a substantial amount of heroin that allegedly belonged to Faulkingham. Under the circumstances presented, this derivative evidence, which consists of the heroin and Power's testimony linking the heroin and its distribution to Faulkingham, was obtained in exploitation of a substantial *Miranda* violation.

### c. No Subsequent Attempts to Purge the Taint of the Initial *Miranda* Violation

In *Byram*, the First Circuit also distinguished its case from *Elstad* by noting that unlike the written confession in *Elstad*, Byram's second statement was not preceded by an adequate *Miranda* warning. *See Byram*, 145 F.3d at 410. With respect to this factor, it is hard to analogize Faulkingham to *Byram*. Certainly, at various points, Faulkingham's comments, both about trusting the agents and about having a retained attorney, should have prompted the agents to advise Faulkingham of his rights but the agents never attempted to mitigate the situation with the use of an intervening warning. Turning once again to the more factually analogous case of *Wong Sun*, it does not appear that the connection between the original *Miranda* violation and the derivative evidence is so attenuated that the derivative evidence can be purged of the taint. *See Wong Sun*, 371 U.S. at 488, 83 S.Ct. 407.

### d. Deterrence Rationale

Additionally, the Court's decision in this case is guided by a key purpose of both the *Miranda* warning and the fruit of the poisonous tree doctrine—deterrence of police misconduct and/or negligence. "The core rationale consistently advanced by this Court for extending the exclusionary rule to evidence that is the fruit of unlawful police conduct has been that this admit-

tedly drastic and socially costly course is needed to deter police from violations of constitutional and statutory protections." *Nix*, 467 U.S. at 442–43, 104 S.Ct. 2501. In this case, exclusion of the derivative evidence would serve to deter the type of substantial *Miranda* violation presented. *See Kruger*, at 102 (explaining that the exclusion of derivative evidence "is necessary to deter law enforcement officers from foregoing the administration of *Miranda* warnings in future cases in which they believe they may successfully gain access to tangible evidence that will be useable at trial despite violation of *Miranda* strictures.")

■ Here, agents failed to give *Miranda* warnings to Faulkingham during the course of two hours of interaction in which Faulkingham unknowingly led an investigation against himself. The two reasons given for the lack of *Miranda* warning were lack of time and "the excitement of the moment." (Recommended Decision at 4.) Under the circumstances of this case, these reasons simply do not justify an officer's failure to inform a suspect of his constitutional rights. *Cf. New York v. Quarles*, 467 U.S. 649, 657, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (creating a public safety exception to the requirements of *Miranda*). The Court believes that suppression of the derivative evidence obtained as a result of Faulkingham's unwarned statements will serve to remind law enforcement that even in "the excitement of the moment" law enforcement retains an important duty to inform an individual taken into custody of his constitutional rights.

## III. CONCLUSION

In short, the Court believes that the derivative evidence that the Government seeks to use against Faulkingham is tainted by the agents' complete failure to utilize any protective device to advise Faulkingham of his Fifth Amendment rights. This negligence on the part of the agents, combined with the other unique circumstances present in this case, mandate suppression of Power's testimony and the evidence obtained as a result of Power's statements to authorities on August 1, 2001.

After conducting a de novo review, the Court finds that Defendant's objections are without merit except for the modification discussed above. In accordance with this modification, the Court suppresses not only Defendant's statements made prior to any *Miranda* warnings, but also suppresses all derivative evidence obtained by authorities as a result of Defendant's unwarned statements. But for this modification, the Court concurs with the Magistrate's recommended factual findings and other legal conclusions. Thus, the Recommended Decision is AFFIRMED as MODIFIED.

SO ORDERED.