# United States Court of Appeals
## For the First Circuit

_____

No. 01-2276

UNITED STATES OF AMERICA,

Appellant,

v.

DAVID C. FAULKINGHAM,

Defendant, Appellee.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

_____

Before

Boudin, Chief Judge,
Lynch and Lipez, Circuit Judges.

_____

F. Mark Terison, Senior Litigation Counsel, with whom Paula D. Silsby, United States Attorney, was on brief for appellant.

Kevin Lawrence Barron, with whom Denner-Sayeg, LLP was on brief for appellee.

_____

July 9, 2002

_____

**LYNCH**, **Circuit Judge**.  David Faulkingham is charged with possession with intent to distribute and conspiracy to distribute heroin.  On the day of his arrest he made inculpatory statements to agents of the Maine Drug Enforcement Agency (MDEA).  The agents did not give the required warning under Miranda v. Arizona, 384 U.S. 436 (1966), before Faulkingham made the statements.  Faulkingham's own statements were thus ordered suppressed under Miranda.  His statements, however, also led to the discovery of derivative evidence that was important to the government's case against him.  That derivative evidence was testimony by a coconspirator and the drugs themselves, and it is the subject of this appeal.

Faulkingham argued, and the district court agreed, that the "fruit of the poisonous tree" doctrine, common to Fourth Amendment jurisprudence, should also apply to the derivative evidence, given the facts of this particular Miranda violation under the Fifth Amendment.  United States v. Faulkingham, 156 F. Supp. 2d 60 (D. Me. 2001).  In the end, the court granted the motion to suppress, believing that "suppression of the derivative evidence . . . will serve to remind law enforcement that even in 'the excitement of the moment' law enforcement retains an important duty to inform an individual taken into custody of his constitutional rights."  Id. at 72.

Individuals in custody should, of course, be informed of their rights.  But we disagree that in this case the concerns that animate the Fifth Amendment require the suppression of the

-2-

derivative evidence, as opposed to the suppression of Faulkingham's own unwarned statements.

I.

We outline the facts in this case as found by the magistrate judge and adopted by the district judge, and supplemented from the record. On July 28, 2000, Mark Leonard, an agent of the MDEA, received information from a confidential informant that Faulkingham was a drug dealer who lived on Route 102 in Tremont, Maine, and drove a tan Lincoln Town Car. The confidential informant also told Leonard that Faulkingham's driver's license was suspended, a fact that Leonard confirmed later that day.

On August 1, Leonard and another MDEA agent, Robert Hutchings, set off for Tremont to follow up on the information Leonard received from the confidential informant. On their way, the agents obtained a 1996 jail photograph of Faulkingham from the Hancock County Sheriff's Department.

When the agents reached the residence, they observed it from their car, which was parked in a driveway not far away. At approximately 3:15 p.m., the agents saw a tan Lincoln Town Car leaving the driveway of the residence. They followed the Town Car, until it slowed down to a stop. Leonard and Hutchings thought the driver of the Town Car matched the person in the photograph of Faulkingham.

Hutchings approached the car, showed his identification shield, said he was an MDEA agent, and told the driver to "shut

[his] car off, and get out of the car." Faulkingham identified himself. Hutchings conducted a patdown search and found cash, heroin, and a syringe on Faulkingham. Hutchings then arrested Faulkingham for operating his vehicle after suspension of his license, handcuffed him, and seated him in the back seat of the agents' car. Hutchings said to Faulkingham: "[J]ust sit here. I don't want you to say anything to me at this point. I have some paperwork we're going to have to do. I have some paperwork I'm going to have to read to you." Hutchings also told Faulkingham that he was "seek[ing] [his] cooperation." Among the paperwork to which Hutchings referred was a form containing the Miranda warning, which, if signed, would confirm that Faulkingham had received the warning.

Hutchings stored the evidence from the patdown search in the trunk of the car. When he returned to Faulkingham, he did not give him the Miranda warning, even though, as the magistrate judge noted, "Hutchings understood that he had a suspect in custody that he intended to interrogate." United States v. Faulkingham, No. CRIM 01-04-B-S, 2001 WL 586667, at *2 (D. Me. May 29, 2001). Faulkingham told Hutchings that he would be sick in about two hours from heroin withdrawal. Hutchings explained to Faulkingham that if he got sick, the agents would "get him medical attention." Faulkingham did not then show physical signs of being under the influence of any drugs, and the agents "kept checking with" Faulkingham throughout the process to see how he was feeling.

-4-

In the meantime, agent Leonard dealt with the two other passengers in the Town Car. After confirming that there were no warrants for the passengers, he told them they could leave, and they left the scene on foot.

Faulkingham told Hutchings that if he was going to cooperate, then the two passengers who were walking away would pose a problem. One of the passengers, Faulkingham said, was the roommate of his supplier, and as soon as he returned to his home "the heroin will either be flushed or hidden or something." Faulkingham also asked the agents what type of deal he could get if he decided to cooperate. The agents explained that they were not authorized to make any deals, but would pass on information about his cooperation to the prosecutor, who could work out a deal with Faulkingham's attorney.

Leonard and Hutchings searched Faulkingham's car, but found no other significant evidence. While they were searching the car, Faulkingham's wife, who happened to drive by the scene, stopped in her red pickup truck. She was dismayed when Hutchings told her of Faulkingham's arrest and said Faulkingham had recently completed a drug rehabilitation program. Hutchings gave Faulkingham's wife permission to speak with him. Faulkingham apologized to her, and asked her to get some bail money and to call his attorney.

As the agents were finishing up their search of Faulkingham's car, Faulkingham got the agents' attention, and when they walked up to their car, he told them that if he was going to

cooperate and be helpful to them, he would have to be on the phone with his supplier by 3:30 p.m. Hutchings and Leonard both realized that it was already 3:28 p.m. Leonard called the agents' supervisor, Peter Arno, to get instructions on how to proceed. Arno gave the agents permission to have Faulkingham contact his supplier and record the phone call.

Faulkingham asked the agents to leave the roadside so that he would not be seen. After releasing Faulkingham from the handcuffs, Hutchings drove the agents' car, with Faulkingham in it, to a marina about a mile away. Leonard followed them in the Town Car. At the marina, Faulkingham made a few attempts to contact his supplier, but he failed because of bad reception. Faulkingham also suspected that his supplier did not answer the phone because he did not recognize the caller ID number, or because the supplier's roommate had already informed the supplier of Faulkingham's arrest. The agents asked Faulkingham how he was feeling to be sure he was not yet sick. Faulkingham continued to appear normal.

Because Faulkingham could not reach his supplier from the marina, he persuaded the agents to go to his house and make the phone call from there. When they arrived at Faulkingham's house, he did make contact with Mark Power, who he said was his supplier.[1] Faulkingham told Power that he had been stopped by the police just for "a driving thing," and had been released by the police. He

---

[1] Power, who later cooperated with the government and became a witness against Faulkingham, denied this and claimed that Faulkingham himself was the supplier. In deciding the motion to suppress, the district court had no need to resolve this conflict, and neither do we.

also told Power that he should come over to the Faulkingham residence with the heroin in order to hide it because MDEA agents were in the area. Eventually, Power arrived at the residence. After being confronted by the agents, Power also agreed to cooperate, and drugs were seized from Power's residence.

Throughout the agents' contact with Faulkingham, they did not administer the Miranda warning to him. At the suppression hearing, they conceded that they should have but had not done so. They explained that lack of time and the rapid pace of the events on the day of the arrest were the reasons for their omission.

II.

Faulkingham, Power, and another coconspirator were indicted for conspiracy to possess and distribute heroin and possessing heroin with the intent to distribute it, in violation of 21 U.S.C. § 841(a)(1), 21 U.S.C. § 846, and 18 U.S.C. § 2.

Faulkingham filed a motion to suppress the statements he made to the MDEA agents while in their custody, Mark Power's testimony, and the heroin to which Power's statements led the agents. The magistrate judge's decision recommended the motion as to Faulkingham's statements be granted because the agents did not give him the Miranda warning, but that the motion as to Power's statements and the physical evidence be denied, because the "fruit of the poisonous tree" doctrine does not apply to the Miranda exclusionary rule. Faulkingham, 2001 WL 586667, at *5-7.

The district court modified the magistrate judge's recommended decision by applying the "fruit of the poisonous tree"

doctrine to this <u>Miranda</u> violation, and suppressing not only Faulkingham's custodial statements, but the derivative evidence of Power's statements and the drugs. <u>Faulkingham</u>, 156 F. Supp. 2d 60. The district court appropriately rejected any per se application of the "fruits" doctrine to the <u>Miranda</u> violation, and made case-specific factual findings. <u>Id.</u> at 70. It found that the <u>Miranda</u> violation was not a technical one, and that it followed from that violation that Faulkingham did not knowingly and intelligently understand that he was waiving his privilege against compulsory self-incrimination. <u>Id.</u> at 70-71. The court found that all the derivative evidence at issue was obtained through Faulkingham's unwarned statements, and that the derivative evidence would not otherwise have been inevitably discovered. <u>Id.</u> at 71. The district court agreed with the magistrate judge's factual findings that there were no coercive official tactics by the police and that Faulkingham's statements were voluntary. <u>Id.</u> at 67-68. The court did not find that the agents had deliberately violated Faulkingham's <u>Miranda</u> rights. <u>Id.</u> at 66. It stated, however, that their failure to give the warning was "negligent, at best." <u>Id.</u> It then reasoned that "Faulkingham's statements were coerced by the lack of a <u>Miranda</u> warning." <u>Id.</u> at 67. It concluded that the deterrence rationale for <u>Miranda</u> dictated the suppression of both Faulkingham's statements and the derivative evidence. <u>Id.</u> at 71-72.

The government now appeals from the suppression order. It argues that the "fruit of the poisonous tree" doctrine does not

apply to Miranda violations.  The government also argues that this court's opinion in United States v. Byram, 145 F.3d 405 (1st Cir. 1998), on which the district court based its decision, does not apply to this case, and that even if the factors considered by the court in Byram were to be used here,[2] the derivative evidence should not be suppressed.

### III.

On an appeal of a disposition of a motion to suppress, "we accept the district court's findings of fact unless clearly erroneous and evaluate its legal conclusions de novo."  United States v. Chhien, 266 F.3d 1, 5 (1st Cir. 2001).  Thus, we must determine anew whether the evidence obtained as a result of Faulkingham's unwarned statements should be suppressed under the fruit of the poisonous tree doctrine.

The requirement that a confession must be voluntary in order to be admitted into evidence rests on two constitutional bases: "the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment."  United States v. Dickerson, 530 U.S. 428, 433 (2000).  It is clear that Faulkingham's statements to the agents were not obtained in

---

[2]     The district court in this case misapprehended Byram as setting down a hard and fast test that fruits evidence must be suppressed when "[f]irst the Miranda violation [is] 'not merely technical.'  Second, there [is] 'a substantial nexus between the violation and the second statement.'  Third . . . 'the second statement is not itself preceded by an adequate Miranda warning.'" Faulkingham, 156 F. Supp. 2d at 69. (quoting Byram, 145 F.3d at 410).  This language from Byram is appropriately read as an attempt to identify and evaluate the competing interests presented in the specific facts of that case, and not as creating a rigid test.

-9-

violation of the Due Process Clause, because an examination of "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation," Schneckloth v. Bustamonte, 412 U.S. 218, 226-27 (1973), shows that Faulkingham expressed a willingness to cooperate with the MDEA agents, and spoke freely to them about his supplier, without even being formally questioned by the agents.

It is also clear, however, that Faulkingham's statements were obtained in violation of the Fifth Amendment because he was not given a Miranda warning. As the district court correctly decided, his statements to the agents should therefore be suppressed. The question here is whether the reasons for mandating a Miranda warning to offset the impact of an inherently coercive custodial interrogation on an individual's Fifth Amendment rights not to incriminate himself, Dickerson, 530 U.S. at 434-35, should also lead to the suppression of derivative evidence, the leads to which are obtained from the statements of a defendant during an unwarned interrogation. In other words, should the evidence derived from Faulkingham's statements, or fruits evidence, also be suppressed because the agents violated the Miranda rule? In considering this question, it is important to keep in mind the "twin rationales" for Miranda: trustworthiness and deterrence. Oregon v. Elstad, 470 U.S. 298, 308 (1985).

In Elstad, the Supreme Court reversed the suppression of derivative evidence in the form of a later warned and voluntary statement, after the initial statement was given without a Miranda

warning, and was itself suppressed. 470 U.S. at 317-18. The Court rejected the application of the fruit of the poisonous tree analysis to determine whether the second statement should be suppressed. Instead, it focused on "whether . . . the second statement was . . . voluntarily made," and concluded that because it was voluntary, it was admissible in evidence. Id. at 318.

After the Supreme Court's decision in Elstad, several circuits adopted a flat rule that a Miranda violation may never lead to suppression of derivative evidence. See, e.g., United States v. Sterling, 283 F.3d 216, 218-19 (4th Cir. 2002); United States v. DeSumma, 272 F.3d 176, 179-81 (3d Cir. 2001); United States v. Gonzalez-Sandoval, 894 F.2d 1043, 1047-48 (9th Cir. 1990); United States v. Sangineto-Miranda, 859 F.2d 1501, 1517-18 (6th Cir. 1988).

By contrast, this court has expressed the tentative view, in the absence of further guidance from the Supreme Court, that Elstad "does not wholly bar the door to excluding evidence derived from a Miranda violation -- at least where the Miranda violation is not merely technical, where there is a substantial nexus between the violation and the [fruits evidence], and where the [fruits evidence, in Byram a second statement made in open court,] is not itself preceded by an adequate Miranda warning." Byram, 145 F.3d at 409-10.

There are at least three categories of evidence that may be derivative fruits of an un-Mirandized confession: physical evidence, statements by a witness who is not the unwarned

-11-

defendant, and later statements by the defendant himself after an initial unwarned statement. Our decision in Byram and the Supreme Court's decision in Elstad involved the third category -- further statements by the defendant. This case involves, instead, only the first two categories -- physical evidence and statements of another witness.

It is entirely plausible to think that the admissibility of these three different categories of evidence derived from un-Mirandized custodial statements should be analyzed in different ways.[3] Nonetheless, the Supreme Court thus far has not differentiated in its analysis between the three categories of derivative evidence and, to the contrary, has used broad language, discouraging the use of the fruits doctrine following a Miranda violation, whatever the nature of the derivative evidence. Elstad, 470 U.S. at 307 ("[T]he Miranda presumption . . . does not require that the statements and their fruits be discarded as inherently tainted."). In deciding that the fruits doctrine did not apply to the Miranda violations on the facts of Elstad, the Court had to distinguish a violation of the Miranda rule from violations of

---

[3] For example, it is arguable that further statements by a defendant himself should be most easily suppressed as the deterrence value of suppression is then high compared to the other two categories, and even later statements by a defendant may involve trustworthiness concerns. (But there is a counter-argument that there is an intermediating opportunity for a later statement to be voluntary. Cf. Elstad, 470 U.S. at 347 & n.29 (Brennan, J., dissenting)). The limited role played by the distinction between the categories of evidence here is to underline the lack of deterrence value and absence of trustworthiness concerns about physical evidence and statements of a third party, which are the subject of the suppression order here.

different clauses of the Constitution to which the fruits doctrine does apply.

The most common application of the fruit of the poisonous tree doctrine is as a remedy for violations of the Fourth Amendment, which protects against unlawful arrests and searches. The Supreme Court first articulated the fruits doctrine in a case where the defendant's Fourth Amendment rights were violated. Wong Sun v. United States, 371 U.S. 471 (1963); see also Taylor v. Alabama, 457 U.S. 687, 689-93 (1982); Dunaway v. New York, 442 U.S. 200, 216-19 (1979). The Court has also applied the doctrine to some violations of the Fifth Amendment, Nix v. Williams, 467 U.S. 431, 442 & n.3 (1984) (citing Murphy v. Waterfront Comm'n, 378 U.S. 52, 79 (1964), which stated that the doctrine applied to the fruits of compelled in-court testimony), and to violations of the Sixth Amendment under the Massiah doctrine,[4] id. at 442 (citing United States v. Wade, 388 U.S. 218 (1967), which applied the fruits doctrine to courtroom identifications resulting from pretrial identifications at which no defense counsel was present, id. at 239-42). Perhaps for that reason, Elstad discussed the particular Fifth Amendment concerns protected by the Miranda rule.

Elstad drew a distinction between Fourth Amendment rights and Fifth Amendment rights, the latter being those that implicate

---

[4]    The Massiah doctrine guarantees the defendant's right to counsel once a criminal proceeding has been initiated, and forbids the government from "'deliberately elicit[ing]' statements from the defendant, in the absence of counsel and without a proper waiver." United States v. Labare, 191 F.3d 60, 64 (1st Cir. 1999) (citing Massiah v. United States, 377 U.S. 201, 206 (1964)).

-13-

*Miranda* warnings, and said that "a procedural *Miranda* violation differs in significant respects from violations of the Fourth Amendment." *Elstad*, 470 U.S. at 306. *Elstad* stated that the purpose of the exclusionary rule under the Fourth Amendment is "to deter unreasonable searches, no matter how probative their fruits." *Id.* The Fourth Amendment is specifically concerned with an individual's privacy and security and so with the methodology that law enforcement officers use in their searches. *Bustamonte*, 412 U.S. at 242. By contrast, *Elstad* reasoned that the Fifth Amendment, by its terms, "is not concerned with non-testimonial evidence. Nor is it concerned with moral and psychological pressures to confess emanating from sources other than official coercion." 470 U.S. at 304-05 (citations omitted). Instead, the Fifth Amendment is meant to safeguard the trustworthiness of testimony at trial and the fairness of the trial. *Id.* at 308; *Bustamonte*, 412 U.S. at 242. Once the un-*Mirandized* inculpatory statements of the defendant are themselves suppressed, the role of deterrence under the Fifth Amendment becomes less primary. As the Court stated in *Bustamonte*, "[t]he guarantees of the Fourth Amendment stand 'as a protection of quite different constitutional values'" from those protected by the Fifth Amendment. 412 U.S. at 242 (quoting *Tehan* v. *United States ex rel. Shott*, 382 U.S. 406, 416 (1966)).[5]

---

[5] In fact, the requirement that a *Miranda* warning be administered by the police is often seen as a safe (though not impregnable) harbor for the police, benefitting the police, perhaps more than the defendant. R.A. Leo, *Questioning the Relevance of Miranda in the Twenty-First Century*, 99 Mich. L. Rev. 1000, 1021-22

Faulkingham argues that Elstad's continuing vitality has been called into question by Dickerson, which reaffirmed the status of Miranda's warning requirement as a constitutional rule binding on the federal and state governments. Dickerson, 530 U.S. at 438-41. It is one thing, Faulkingham says, to decline to suppress evidence that is the fruit of a Miranda violation when there was a doubt as to whether Miranda was a constitutionally grounded rule or was merely a prophylactic procedure, as it was described in Elstad, 470 U.S. at 306, and Michigan v. Tucker, 417 U.S. 433, 444 (1974). It is another, he argues, to fail to use the fruits doctrine now that we know from Dickerson that Miranda is constitutionally grounded.

We agree in part with Faulkingham: Dickerson does strengthen his claim. But Dickerson does not itself win the day for him. Dickerson cited Elstad, without overruling it, stating that its "decision in that case -- refusing to apply the traditional 'fruits' doctrine developed in Fourth Amendment cases -- does not prove that Miranda is a nonconstitutional decision, but simply recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under

(2001) ("By creating the opportunity for police to read suspects their constitutional rights and by allowing police to obtain a signed waiver form that signifies consensual and non-coercive interrogation, Miranda has helped the police shield themselves from evidentiary challenges. . . ."); see also Dickerson, 530 U.S. at 444 (noting that the Miranda rule is beneficial to law enforcement officers because it is relatively easy "to apply in a consistent manner"). As Dickerson notes, "Miranda has become embedded in routine police practice to the point where the warnings have become part of our national culture." 530 U.S. at 443.

the Fifth Amendment." Id. at 440. The various differences in purpose behind the Fourth and Fifth amendments, articulated in Elstad, continue unchanged by Dickerson, and those differences affect the remedial options appropriate for violations of the two distinct constitutional amendments, and, more specifically, for violations of the Miranda rule.

Unlike some other circuits, we are unwilling, at least until the Supreme Court addresses the issue, to say that the interest of deterrence may never lead to the suppression of derivative evidence from a Miranda violation. In Byram, this court suppressed both the original unwarned statements and later statements made at trial. The court considered the circumstances surrounding both the original confession and the later statement. Byram, 145 F.3d at 410. Between the two statements, Byram was kept in jail without ready access to counsel, subpoenaed, given no new warning, and deliberately asked questions by the prosecutor to elicit the same self-incriminating statements he had given earlier. Id. at 410; cf. United States v. Esquilin, 208 F.3d 315, 318-21 (1st Cir. 2000) (suppressing the first un-Mirandized statement, but admitting the post-Miranda statements after examining the circumstances surrounding those statements and whether they were voluntary); Tankleff v. Senkowski, 135 F.3d 235, 244-45 (2d Cir. 1998) (after considering the "totality of the circumstances," the court did not suppress the second statement because the defendant was warned between the first and second statements and the statement was voluntary).

But deterrence weighs less heavily on the Fifth Amendment legal scale, which balances the value of the derivative evidence to the truth seeking process against the protection of the defendant's Fifth Amendment rights, once the defendant's own statements are suppressed. The balance, to the extent the Supreme Court's case law may permit balancing, necessarily involves weighing the reliability of the unwarned derivative evidence against the need for deterrence. Here, the derivative evidence is itself reliable. Further, the defendant's own statements were not coerced and were not unreliable in the classic sense of involuntariness. See Dickerson, 530 U.S. at 432-33 (stating that before Miranda, "the law governing the admission of confessions" was concerned with the unreliability of coerced confessions); Elstad, 470 U.S. at 304 (same). Where, as here, negligence is the reason that the police failed to give a Miranda warning, the role of deterrence is weaker than in a case, such as Byram, where the apparent reason the police failed to give a warning was their intention to manipulate the defendant into giving them information.

Faulkingham's claim, taking all the surrounding circumstances into account, simply does not tip the balance toward a strong need for deterrence. Faulkingham's statement was not the result of "coercive official tactics." Faulkingham, 156 F. Supp. 2d at 67 (internal quotations marks omitted) (quoting Byram, 145 F.3d at 407). There was no deliberate misconduct by the MDEA agents here. There was no misleading or manipulation by the government, as was true in Byram. The findings of the magistrate

-17-

judge and the trial judge give us no reason to think that the agents deliberately failed to give the warning in order to get to the physical evidence or that they did so to get to another witness who might or might not incriminate Faulkingham. The agents' negligence resulted in the suppression of Faulkingham's confession, itself a detriment to the agents, who conceded at the suppression hearing that they did not administer the Miranda warning, and that they should have done so.

In fact, Faulkingham himself started talking without much questioning. Agent Hutchings requested Faulkingham's cooperation, but Faulkingham, on his own, began to give the agents the information about Mark Power. When Faulkingham told the agents the crucial information that he must make the call to Power in the next few minutes, the agents were not even in their car with Faulkingham. They were in the process of searching Faulkingham's car, and Faulkingham got their attention because he wanted to speak to them.

The facts of this case also do not raise any of the concerns that are typically raised under other constitutional provisions that do trigger the fruits doctrine: there is no Fourth Amendment violation and no violation of the right to counsel. In addition, there is nothing to shock the conscience of the court and no fundamental unfairness. We do not say what the appropriate remedy would be if the facts surrounding the Miranda violation involved some of these other concerns or a very strong need for

deterrence.  Perhaps the Supreme Court will address those facts before we need to do so.

We do hold, on the facts here, that Faulkingham's far weaker argument for recognition of a deterrence interest for suppression of derivative evidence arising from a negligent violation of his <u>Miranda</u> rights is insufficient to carry the day.

Accordingly, we reverse the grant of the suppression motion and remand for further proceedings not inconsistent with this opinion.  <u>So ordered</u>.