# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3101

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff-Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the District |
| | * | of Minnesota. |
| Angel Benito Villalba-Alvarado, a/k/a | * | |
| Benito Angel Alvara Villalba, | * | |
| | * | |
| Defendant-Appellee. | * | |

_____

Submitted:  February 12, 2003
Filed:  October 10, 2003

_____

Before WOLLMAN, HEANEY, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Plaintiff-Appellant the United States of America appeals the suppression of physical evidence derived from a violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), as well as the suppression of Defendant-Appellee Angel Benito Villalba-Alvarado's later, post-warning/post-waiver statements also derived from the earlier <u>Miranda</u> violation. We reverse. The post-waiver statements were voluntary and are admissible notwithstanding the earlier <u>Miranda</u> violation. <u>United States v. Fellers</u>,

285 F.3d 721, 724 (8th Cir. 2002), <u>cert.</u> <u>granted</u>, 123 S.Ct. 1480 (March 10, 2003) (citing <u>Oregon v. Elstad</u>, 470 U.S. 298, 309 (1985)).  Further, we join the Third and Fourth Circuits to hold that a <u>Miranda</u> violation does not demand the suppression of derivative physical evidence if the non-<u>Mirandized</u> statement was voluntary.

I.

After conducting controlled drug buys with pre-recorded currency, officers obtained a search warrant covering Defendant's car, home, and person.  Defendant does not challenge the validity of the warrant.  To execute the warrant, a team of officers approached Defendant's home.  Other officers recognized Defendant in his car on a nearby street, stopped him, handcuffed him, and brought him to the home.  Without the provision of a <u>Miranda</u> warning, Defendant voluntarily confessed to officers in the home the locations of (1) a hidden panel in a built-in dresser that concealed approximately one-half pound of cocaine and a scale, and (2) a coat hanging in a closet with $3,360 in its pocket, $700 of which comprised pre-recorded currency from the controlled buys.[1]

The team searched Defendant's home for an additional forty-five minutes after finding the drugs, scale, and currency in the locations identified by Defendant, but found no other evidence.  The lead officer described the usual procedure for executing search warrants of similar scope.  Under this described procedure, teams would start their examination in the center of each room and work outwardly,

_____

[1]Although the situation at Defendant's home was clearly "custodial," it is not clear that an "interrogation" occurred.  <u>Miranda</u>, 384 U.S. at 444 (holding the well-known warnings to defendants to be necessary in situations involving "custodial interrogations" by police).  Nevertheless, because the United States Attorney conceded before the district court that a <u>Miranda</u> violation had occurred, we must assume that the circumstances in Defendant's home did comprise a custodial interrogation.

examining everything from floor to ceiling. Next, officers would expand their search with follow-up passes through each room by different officers. Finally, if these steps failed to reveal evidence, dogs would be used. In an apparent attempt to demonstrate that Defendant's hidden panel was typical of hiding places encountered in prior drug searches, and therefore, that the hidden panel inevitably would have been discovered, the lead officer claimed that he previously had found evidence in very unusual places. When the United States Attorney asked the officer to list examples of such places, however, the presiding magistrate judge granted Defendant's relevancy objection and prevented the officer from answering. Finally, there was no evidence to suggest that the hidden panel was detectable upon observation, that officers suspected the existence of the hidden panel, or that the built-in dresser otherwise displayed characteristics that would have aroused officer suspicion.

The team's lead officer claimed that a drug dog happened to be available in the general vicinity of the home. The dog, however, was not part of the search team, and the team did not employ the dog in light of the assistance provided by Defendant. Further, the lead officer could not identify the names of the drug dog or its controlling officer. There also was testimony that the use of drug dogs is a normal component of searches where drugs are suspected but not discovered. Although the lead officer described in general the role of dogs in the execution of drug-related search warrants, he did not state specifically that he would have used the dog in this particular case if his team's search had failed to produce results.

After the search, officers took Defendant to the police station where he was given a Miranda warning in Spanish. Through a translator, he waived his rights and proceeded to re-describe the location where the drugs were found. He also identified his California-based drug supplier. Police recorded these post-waiver statements.

Defendant moved for suppression of the drugs, scale, and currency as well as suppression of the statements made in his home and the later, post-warning/post-

waiver statements made at the police station. The United States argued that the physical evidence need not be suppressed as the fruit of a Fifth Amendment Miranda violation, that the physical evidence inevitably would have been discovered, and that the subsequent Miranda warning and Defendant's waiver of rights at the police station made any post-waiver statements admissible because the warning and waiver served to cleanse any taint that might have lingered from the original Miranda violation.

After a suppression hearing, the magistrate judge recommended: (1) suppression of the drugs and scale based on the conceded Miranda violation and the fruit of the poisonous tree doctrine of Wong Sun v. United States, 371 U.S. 471, 485 (1963); (2) admission of the currency under the doctrine of inevitable discovery; and (3) suppression of Defendant's post-waiver statement at the police station as further fruit of the original poisonous tree. The district court adopted most of the magistrate judge's report, but admitted a portion of the post-warning statement that was not related to the location of the drugs and scale (i.e., suppressed the drugs and scale but admitted the currency and all but the first ten minutes of the post-warning statement that Defendant made in the police station). The United States appeals.

II.

We address the admissibility of Defendant's post-waiver statement first. The Supreme Court addressed this issue in Elstad, 470 U.S. 298, namely, "whether the Self-Incrimination Clause of the Fifth Amendment requires the suppression of a confession, made after proper Miranda warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary but unwarned admission from the defendant." Id. at 303. The Court noted that arguments in favor of extending the fruit of the poisonous tree doctrine into the Miranda setting to suppress a later, voluntary, post-waiver/post-warning statement necessarily rested on the belief that the initial violation placed an irreparable degree of psychological compulsion upon

a Defendant, who, by having "let the cat out of the bag," could not thereafter make a truly voluntary statement concerning the same subject matter. Id. at 302. The Court, while noting this argument, rejected any extension of the fruits doctrine under this "cat out of the bag" theory and held that the pre-Miranda standard of voluntariness governed the admissibility of subsequent, warned statements:

> It is an unwarranted extension of Miranda to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

Elstad, 470 U.S. at 309.[2]

---

[2]This conclusion is consistent with the Court's pre-Miranda Fifth Amendment jurisprudence as set forth inUnited States v. Bayer, 331 U.S. 532 (1947):

> [A]fter an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession may always be looked upon as fruit of the first. *But this court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables a confessor from making a usable one after those conditions have been removed.*

Id. at 540-41 (emphasis added).

En route to reaching the conclusion that a subsequent, warned statement was to be judged under the pre-Miranda standard of voluntariness rather than suppressed as fruit of the poisonous tree, the Court restated its general position that the exclusionary rule and the fruits doctrine apply differently to Miranda violations under the Fifth Amendment than to unreasonable searches under the Fourth Amendment. Elstad, 470 U.S. at 304-307 (quoting Brown v. Illinois, 422 U.S. 590, 601 (1975) for the proposition that "[t]he exclusionary rule, . . . when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth," and noting that metaphors such as fruit of the poisonous tree and cat out of the bag "should not be used to obscure fundamental differences between the role of the Fourth Amendment exclusionary rule and the function of Miranda in guarding against the prosecutorial use of compelled statements as prohibited by the Fifth Amendment.").

The Court continued this explanation by noting the fact that it had already established exceptions to the application of the exclusionary rule in the context of Fifth Amendment violations. In particular, the Court noted various permissible uses even of an *initial*, voluntary, unwarned statement obtained in violation of Miranda. Elstad 470 U.S. at 307 (noting the admissibility of initial, voluntary, unwarned statements for the purpose of impeachment and cross-examination). The Court also noted that in Michigan v. Tucker, 417 U.S. 433, 445 (1974), it refused to extend the fruits doctrine to exclude testimony from a prosecution witness identified through a defendant's voluntary, albeit unwarned, statement obtained in violation of Miranda.

Had this been the extent of the Court's decision in Elstad, the present issue would be clear. The Court, however, also employed language from earlier Fifth Amendment cases that characterized the protections of Miranda as merely prophylactic in nature. Elstad, 470 at 305 (quoting New York v. Quarles, 467 U.S. 649, 654 (1984) which in turn quoted Tucker, 417 U.S. at 444, for the proposition that, "[t]he prophylactic Miranda warnings therefore are 'not themselves rights

-6-

protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected.'"). Following Elstad, then, it was not clear if the refusal to extend the fruits doctrine in the context of subsequent, warned statements rested on the Court's distinction between application of the exclusionary rule in the context of Fourth Amendment and Fifth Amendment violations or on the Court's characterization of the Miranda protections as merely prophylactic and not constitutional in nature.

Defendant seizes upon this lack of clarity to argue that we should not apply the ruling of Elstad. In particular, he argues that a more recent Supreme Court decision, Dickerson v. United States, 530 U.S. 428, 444 (2000), calls into question the continuing validity of Elstad. In Dickerson, the Court announced that the Miranda protections were not merely prophylactic in nature, but rather, were themselves constitutionally required. Dickerson, 530 U.S. at 444 (holding that Congress could not overrule Miranda and force a return to the pre-Miranda voluntariness standard for judging the admissibility of confessions because the protections of Miranda were themselves constitutional in stature). The Court in Dickerson conceded that it had, in the earlier progeny of Miranda, characterized the Miranda protections as merely prophylactic. Dickerson, 530 U.S. at 438. The Court dismissed the impact of these earlier characterizations, however, and expressly stated that it was not overruling its own precedent or removing any of the established exceptions to Miranda:

> While we have overruled our precedents when subsequent cases have undermined their doctrinal underpinnings, . . . we do not believe that this has happened to the Miranda decision. If anything, our subsequent cases have reduced the impact of the Miranda rule on legitimate law enforcement while reaffirming the decision's core ruling that unwarned statements may not be used as evidence in the prosecution's case in chief.

Dickerson, 530 U.S. at 443-44 (internal citation omitted).

Defendant nevertheless relies on the language from Elstad and other pre-Dickerson cases that suggested Miranda was merely prophylactic in order to argue that Dickerson removed the doctrinal underpinnings from these cases and therefore overturned the pre-existing exceptions to Miranda.

We agree with Defendant that Elstad appeared to rely on the fact that the Court had previously referred to Miranda protections as merely prophylactic. We disagree, however, with Defendant's assertion that Dickerson wholly undermined Elstad or overruled Elstad by implication. In fact, the Court in Dickerson specifically addressed the apparent inconsistency of its characterization of the Miranda protections in Elstad and Dickerson:

> [Supreme Court cases that established exceptions to Miranda's warning requirements] illustrate the principle – not that Miranda is not a constitutional rule – but that no constitutional rule is immutable. No court laying down a general rule can possibly foresee the various circumstances in which counsel will seek to apply it, and the sort of modifications represented by these cases are as much a normal part of constitutional law as the original decision. . . .
>
> *Our decision in that case [Elstad] – refusing to apply the traditional "fruits" doctrine developed in Fourth Amendment cases – does not prove that Miranda is a nonconstitutional decision, but simply recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment.*

Dickerson, 530 U.S. at 441 (emphasis added). Based on this language, we conclude that the Court intended to reaffirm the validity of Elstad by reaffirming the distinction between application of the exclusionary rule following Fourth and Fifth Amendment violations. By focusing on this distinction and refusing to read the opinion in Elstad in the manner now urged by Defendant, i.e., as having relied solely on characterization of the Miranda warnings as merely prophylactic, the Court attempted

-8-

to clarify the rationale applied in <u>Elstad</u> and, we believe, clearly suggested that <u>Elstad</u> was to survive <u>Dickerson</u> unaffected by the apparent removal of doctrinal underpinnings. As such, we are compelled to remain faithful to the established exceptions under <u>Miranda</u>. Other circuits have adopted a similar view of <u>Dickerson</u>'s impact on <u>Elstad</u>. <u>See</u> <u>United States v. Sterling</u>, 283 F.3d 216, 219 (4th Cir. 2002) ("In addition, we are of the opinion that the Court's reference to and reaffirmation of <u>Miranda</u>'s progeny indicates that *the established exceptions, like those in <u>Tucker</u> and <u>Elstad</u> survive. Thus the distinction between statements and derivative evidence survives <u>Dickerson</u>.*") (emphasis added); <u>United States v. De Summa</u>, 272 F.3d 176, 179-80 (3rd Cir. 2001) (recognizing the ongoing validity of <u>Elstad</u> following <u>Dickerson</u> and interpreting <u>Elstad</u> as having broad application not only to derivative statements, but to other forms of derivative evidence, including derivative physical evidence); <u>United States v. Patane</u>, 304 F.3d 1013, 1024-25 (10th Cir. 2002) (recognizing the ongoing validity of <u>Elstad</u>, but refusing to extend that ruling into the setting of derivative physical evidence, stating, "[W]e respectfully disagree with [the] conclusion that <u>Dickerson</u>'s reference to the controlling force of '<u>Miranda</u> and its progeny in this Court' forecloses the argument that the physical fruits of a <u>Miranda</u> violation may be suppressed. *Although we agree that, based on this language, the holdings of <u>Elstad</u> and <u>Tucker</u> survive <u>Dickerson</u>*, neither <u>Elstad</u> nor <u>Tucker</u> involved the physical fruits of a <u>Miranda</u> violation . . . . By wholly undermining the doctrinal foundation upon which those holdings were built, <u>Dickerson</u> effectively left <u>Elstad</u> and <u>Tucker</u> standing but prevented lower courts from extending their holdings.") (emphasis added).

Finally, and perhaps most importantly, our court already recognized the ongoing validity of <u>Elstad</u> sub-silentio in a post-<u>Dickerson</u> case. <u>See</u> <u>Fellers</u>, 285 F.3d at 724 (holding, after <u>Dickerson</u>, that a post-warning/post-waiver statement was voluntary and therefore admissible even though the statement followed an earlier <u>Miranda</u> violation). In light of the Court's recognition of an ongoing distinction in the application of the exclusionary rule under the Fourth and Fifth Amendments, and in light of our decision in <u>Fellers</u>, we must reject Defendant's attack upon <u>Elstad</u>.

Accordingly, the post-waiver statement in this case need not be suppressed merely because it was the fruit of an earlier <u>Miranda</u> violation.

We instead analyze admissibility of the statement under the standard of voluntariness. "The voluntariness of a confession is a legal inquiry subject to plenary appellate review." <u>Fellers</u>, 285 F.3d at 724 (citing <u>United States v. Robinson</u>, 20 F.3d 320, 322 (8th Cir. 1994)). Because Defendant argues neither that his unwarned statement was actually compelled nor that some governmental action (beyond the initial failure to warn) made his post-waiver statement involuntary, we find the entirety of his post-waiver statement admissible.

### III.

The Supreme Court has yet to specifically address the admissibility of the physical fruits of a <u>Miranda</u> violation. <u>Patterson v. United States</u>, 485 U.S. 922 (1988) (". . . this Court expressly left open the question of the admissibility of physical evidence obtained as a result of an interrogation conducted contrary to the rules set forth in <u>Miranda v. Arizona</u>.") (White, J., dissenting from the denial of certiorari), <u>accord</u> <u>United States v. Patane</u>, 304 F.3d 1013, 1022 (10th Cir. 2002), <u>cert. granted</u>, 123 S.Ct. 1788 (April 21, 2003). Prior to <u>Dickerson</u>, many courts interpreted the rulings of <u>Elstad</u> and <u>Tucker</u> as being widely applicable to various forms of derivative evidence, including physical derivative evidence. <u>See</u>, <u>e.g.</u>, <u>United States v. Cherry</u>, 759 F.2d 1196, 1210 (5th Cir. 1985); <u>United States v. Saginto-Miranda</u>, 859 F.2d 1501, 1517 (6th Cir. 1988); <u>United States v. Elie</u>, 111 F.3d 1135, 1141 (4th Cir. 1997); <u>United States v. Gonzalez-Sandoval</u>, 894 F.2d 1043, 1048 (9th Cir. 1990). Following <u>Dickerson</u>, however, a circuit split developed on the issue of whether <u>Elstad</u> and <u>Tucker</u> must be limited to their facts – derivative warned statements and third party testimony, respectively – or whether these <u>Miranda</u> progeny announced a general rule that remained applicable to various forms of derivative evidence even following <u>Dickerson</u>. We addressed similar issues, but only in a pre-<u>Dickerson</u> setting. Having now been given the opportunity to directly address this

-10-

issue in the wake of <u>Dickerson</u>, we join the Third and Fourth Circuits to hold that the exclusionary rule as applied under the Fifth Amendment does not require the suppression of physical evidence derived from a voluntary, non-<u>Mirandized</u> statement.

Defendant argues against the admission of the physical evidence (as he argued above against the admission of his subsequent statement) by asserting that <u>Dickerson</u> removed the doctrinal underpinnings from the established <u>Miranda</u> exceptions. In this context, Defendant's argument is, arguably, stronger than in the context of his subsequent warned statement. In this instance, he argues against the application of <u>Elstad</u> and <u>Tucker</u> as applied generally to different forms of derivative evidence, not merely as applied in the narrow context of subsequent, warned statements or derivative testimony. As explained in Section II, supra, we reject the argument that <u>Dickerson</u> eviscerated the theoretical underpinnings of <u>Elstad</u> and <u>Tucker</u> to the extent urged by Defendant. Accordingly, we approach the issue of the admissibility of the physical fruits of a <u>Miranda</u> violation from the starting point that two other – arguably less reliable – forms of derivative evidence may be admissible following a <u>Miranda</u> violation, namely, a defendant's subsequent warned statement, <u>Elstad</u>, 470 U.S. at 309, and testimony from a witness identified through a defendant's earlier, unwarned statement, <u>Tucker</u>, 417 U.S. at 445. We must determine, then, whether derivative physical evidence differs from these other forms of derivative evidence in a manner that would affect its admissibility under the rule of <u>Elstad</u> and <u>Tucker</u>, and whether the Supreme Court has suggested that such a distinction would be a valid basis for treating physical derivative evidence differently than subsequent statements or testimony.

We start by addressing our pre-<u>Dickerson</u> applications of <u>Elstad</u> in cases involving physical derivative evidence to determine if, in the context of derivative evidence, we have established or recognized any distinctions that merit consideration. In <u>United States v. Carter</u>, 884 F.2d 368, 374-75 (8th Cir. 1989), we upheld the suppression of physical evidence obtained during a search that followed an un-

-11-

warned statement made during a custodial interrogation. We held the evidence inadmissible based on the government's failure to prove that the defendant's later-granted consent for the search was voluntary. Id. Accordingly, we did not address the scope of Elstad by determining whether the physical fruits or a consent to search flowing from a Miranda violation would be admissible where the earlier, unwarned statement was voluntary.

In United States v. Wiley, 997 F.2d 378, 383 (8th Cir. 1993), overruled on other grounds by United States v. Bieri, 21 F.3d 819, 823 (1994), we relied on Elstad to hold that, following a Miranda violation involving a voluntary statement, a subsequent grant of consent for a search and the physical evidence that flowed from that search were admissible because the subsequent consent was not tainted by the earlier Miranda violation. We stated:

> We assume that if the [Eighth Circuit in Carter] had found the consent to be voluntary, the alleged "taint" would not have prevented the Court from admitting the evidence. By analogy to Elstad and Carter, the evidence seized here was admissible if both the unwarned statement and the consent to search were voluntary.

Wiley, 997 F.2d at 383. Accordingly, we did not address the admissibility of physical fruits that flowed directly from a Miranda violation,[3] but we did address the admissibility of the physical fruits that flowed indirectly from a Miranda violation. While not controlling, we find Wiley instructive because it establishes that this court, prior to Dickerson, did not read Elstad as having pronounced a narrow rule applicable only to subsequent warned statements. Rather, we read Elstad as having pronounced

---

[3]Even though the subsequent statement in the present case, in fact, provided the location of the drugs, scale, and money, we have chosen to characterize the physical evidence not as the fruit of Defendant's later, voluntary, post-warning statement provided at the police station, but rather as the direct fruit of the earlier Miranda violation. Accordingly, we do not rely on Wiley as precedent that is directly on point.

-12-

a rule of more general applicability that embraced various forms of derivative evidence.

We next examine the purpose of the Miranda requirements to determine whether Miranda and the Fifth Amendment suggest a need to draw a distinction between derivative physical evidence and other forms of derivative evidence. The purpose of the Miranda protections are two-fold. First, suppression is a deterrent to the use by overzealous police of interrogation techniques that may overbear the will of defendants and lead to involuntary and unknowing waivers of the right against self incrimination. It is plain upon reading Miranda that the deterrence rationale served as the primary theoretical underpinning for the Court's decision. The Court addressed this rationale at great length, discussed the development of the right against self incrimination, detailed official interrogators' historical and current practices, noted the ability of police tactics to overbear the will of defendants, and emphasized the need to curtail overzealous interrogation by suppressing the intended fruit of the abusive interrogation, namely, the defendant's confession. Miranda, 384 U.S. at 445-455.

In Miranda itself, the Court made passing reference to a second rationale – the inherent unreliability of coerced statements and the need to safeguard the truth-seeking function of the courts by protecting defendants against the admission of unreliable evidence. See, e.g, id. at 469-472. In Miranda's progeny, the Court expounded on this trustworthiness rationale. See Tucker, 417 U.S. at 448 ("When involuntary statements or the right against compulsory self-incrimination are involved, a second justification for the exclusionary rule also has been asserted: protection of the courts from reliance on untrustworthy evidence."); Elstad, 470 U.S. at 308 (". . . the twin rationales – trustworthiness and deterrence"); Dickerson, 530 U.S. at 433 ("The roots of [the traditional voluntariness test] developed in the common law, as the courts of England and then the United States recognized that coerced confessions are inherently untrustworthy.").

-13-

When dealing with the suppression of a witness' presumptively coerced statement – the actual statement involved in the <u>Miranda</u> violation – the two rationales of deterrence and trustworthiness work in tandem to reinforce one another in supporting the suppression of a defendant's statement. If the incentive to obtain coerced statements is removed, police should be deterred against using coercive methods. If a coerced statement is suppressed, a defendant is protected against the damning consequences of a potentially untruthful, coerced statement. The Court recognized and reaffirmed the importance of both rationales in <u>Elstad</u> when it discussed <u>Tucker</u>, stating:

> In deciding "how sweeping the judicially imposed consequences" of a failure to administer <u>Miranda</u> warnings should be, 417 U.S., at 445, . . . , the <u>Tucker</u> Court noted that *neither the general goal of deterring improper police conduct nor the Fifth Amendment goal of assuring trustworthy evidence would be served by suppression of the witness' testimony.* The unwarned confession must, of course, be suppressed, but the Court ruled that introduction of the third-party witness' testimony did not violate Tucker's Fifth Amendment rights.
>
> We believe this reasoning applies with equal force when the alleged "fruit" of a noncoercive <u>Miranda</u> violation is neither a witness *nor an article of evidence* but the accused's own voluntary testimony. As in <u>Tucker</u>, the absence of any coercion or improper tactics undercuts the twin rationales – trustworthiness and deterrence – for a broader rule.

<u>Elstad</u>, 470 U.S. at 308 (emphasis added). In <u>Elstad</u>, as in <u>Tucker</u>, where the court found that the "twin rationales – trustworthiness and deterrence" did not support suppression, the Court admitted the derivative statement. This is in contrast with the situation involving the suppression of a presumptively coerced and inherently unreliable statement. <u>Id.</u> ("The unwarned confession must, of course, be suppressed . . .").

Turning specifically to derivative physical evidence, we cannot discern that the deterrence rationale serves a role that is greater or lesser than the role it serves in the context of derivative statements. The trustworthiness rationale, however, appears to fall away entirely and, if anything, militate against suppression. Physical evidence speaks for itself. The reliability of derivative physical evidence is not called into doubt by the fact of an underlying Miranda violation. Accordingly, the recognized purposes of the Fifth Amendment exclusionary rule, as applied under Miranda, suggest that the case for the admission of derivative physical evidence is stronger even than the case for the admission of derivative, voluntary statements as sanctioned by the Court in Elstad and Tucker.

Turning next to decisions from other circuits, we find post-Dickerson cases that are directly on point. In United States v. DeSumma, 272 F.3d 176, 177 (3rd Cir. 2001), the Third Circuit refused to suppress a pistol as fruit of the poisonous tree from a non-Mirandized statement because, "suppressing evidence derived from a voluntary but unwarned confession serves neither the goal of deterring coercive police misconduct nor the purpose of ensuring trustworthy evidence." In DeSumma, before administering any warnings, an agent handcuffed and patted down the defendant. Having failed to detect any weapons, the agent asked the defendant if he had any weapons. The defendant replied that there was a weapon in his car and gave the agent the pad combination to open the car. After a suppression hearing, where the district court determined that the pistol from the car was admissible, the Supreme Court issued its opinion in Dickerson. On review, the Third Circuit considered the impact of Dickerson, read Dickerson as having anticipated the attacks on Elstad, and interpreted Dickerson as having spoken directly in defense of Elstad. The DeSumma court stated, "Dickerson thus continued to observe the distinction between Miranda's application to cases involving the Fifth, rather than the Fourth, Amendment. Ultimately, the Fifth Amendment prevents the use of the non-Mirandized statement rather than the introduction of derivative evidence." DeSumma, 272 F.3d at 180. Accordingly, the Third Circuit relied on Dickerson's distinction between Fourth and Fifth Amendment violations to conclude that Elstad

remained valid precedent. In addition, the Third Circuit read Elstad, post-Dickerson, as generally applicable to derivative physical evidence as well as derivative statements. This approach is consistent with the Eighth Circuit's pre-Dickerson understanding of Elstad as being applicable to various forms of derivative evidence. See Wiley, 997 F.2d at 383.

In United States v. Sterling, 283 F.3d 216, 218-219 (4th Cir. 2002), a post-Dickerson case, the Fourth Circuit applied Elstad when it refused to suppress the physical fruits of a Miranda violation. Factually, Sterling is similar to DeSumma. In Sterling officers restrained a suspect in his home while searching for weapons in the immediate vicinity. Officers found a handgun, and, before administering a warning, asked the suspect if he had any other weapons. The suspect responded that there was a shotgun outside in a truck. In holding that the shotgun was admissible, the Fourth Circuit first reviewed its own pre-Dickerson cases that involved refusals to apply the fruit of the poisonous tree doctrine to suppress physical evidence derived from Miranda violations. Sterling, 283 F.3d at 219 ("[T]he exceptions the Court established in Tucker and Elstad, supported [the] holding that 'derivative physical evidence obtained as a result of an unwarned statement that was voluntary under the Fifth Amendment is never fruit of the poisonous tree.'" (quoting United States v. Elie, 111 F.3d 1135, 1142 (4th Cir. 1997))). The Fourth Circuit, like the Third Circuit in DeSumma, relied on Dickerson's affirmation of Elstad. Noting that "overruling by implication is not favored", Sterling, 283 F.3d at 219 (citing Agostini v. Felton, 521, U.S. 203, 237 (1997)), the Fourth Circuit maintained its pre-Dickerson interpretation of Elstad and Tucker as applicable not only to subsequent statements and derivative witness testimony, but also to physical derivative evidence.

The First Circuit, in United States v. Faulkingham, 295 F.3d 85 (1st Cir. 2002), reached a different conclusion from that of the Third and Fourth Circuits. The facts in Faulkingham involved a defendant whose non-Mirandized, albeit voluntary statement led to the testimony of a co-conspirator and the seizure of illegal drugs. The First Circuit acknowledged the Court's recognition of the "'twin rationales' for

-16-

Miranda: trustworthiness and deterrence." Id. at 90 (citing Elstad, 470 U.S. at 308). It then noted at least three categories of derivative evidence: "physical evidence, statements by a witness who is not the unwarned defendant, and later statements by the defendant himself after an initial unwarned statement." Faulkingham, 295 F.3d at 91. Finding no controlling Supreme Court authority for the proposition that different forms of derivative evidence merit different treatment, but interpreting Dickerson's pronouncement of the constitutional stature of Miranda as having strengthened arguments in favor of suppression, the First Circuit created a test for the admissibility of derivative evidence that considered the relative importance of the deterrent and trustworthiness rationales on a case-by-case basis. As noted by the First Circuit, "[t]he balance [of the goals of deterrence and trustworthiness] necessarily involves weighing the reliability of the unwarned derivative evidence against the need for deterrence." Id. at 93. In applying the test, the court determined derivative physical evidence was itself reliable and, because the officer's actions were merely negligent rather than intentionally manipulative, the need for deterrence was low. Id. After Faulkingham, then, the physical fruits of a Miranda violation in the First Circuit may be admitted dependent upon the degree of malfeasance or misfeasance of the offending officer viewed in light of the degree of inherent reliability or unreliability of the particular derivative evidence.

In Patane, the Tenth Circuit surveyed and rejected the approaches of the First, Third, and Fourth Circuits. The Tenth Circuit found that Dickerson did, in fact, undermine the doctrinal basis of Elstad and Tucker such that these two Miranda progeny survived Dickerson but could not be extended beyond their facts to apply in the context of physical derivative evidence. Patane, 304 F.3d at 1024-25. In reaching this conclusion, the court in Patane emphasized the extent to which the pre-Dickerson progeny of Miranda relied upon the now-invalid view that the protections of Miranda were merely prophylactic. In addition, the Tenth Circuit criticized Dickerson's reliance on a distinction between application of the exclusionary rule under the Fourth and Fifth Amendments as insufficient to explain

-17-

the Court's earlier references to <u>Miranda</u> as merely prophylactic. <u>Patane</u>, 304 F.3d at 1025 ("<u>Elstad</u> 'recognizes . . . that unreasonable searches under the Fourth Amendment are *different* from unwarned interrogation under the Fifth Amendment.' . . . The critical question, of course, is *how* the two are different."). Finally, the court in <u>Patane</u> interpreted the decision in <u>Elstad</u> (and presumably the decision in <u>Tucker</u>) as being uniquely dependent upon the ability of a witness or defendant to insulate a subsequent statement or confession from the underlying <u>Miranda</u> violation through the exercise of volition that is necessary to provide testimony. <u>See</u> <u>Elstad</u>, 470 U.S. at 308-309 ("[A] living witness is not to be mechanically equated with the proffer of inanimate evidentiary objects illegally seized. . . . [T]he living witness is an individual human personality whose attributes of will, perception, memory, and *volition* interact to determine what testimony he will give."); <u>see also</u> <u>id.</u> at 347 n.29 (Brennan, J. dissenting) ("Notwithstanding the sweep of the Court's language, today's opinion surely ought not be read as also foreclosing application of the traditional derivative-evidence presumption to physical evidence obtained as a proximate result of a <u>Miranda</u> violation. The Court relies heavily on individual 'volition' as an insulating factor in successive confession cases.").

Our review of other circuits' treatment of derivative physical evidence convinces us that the approach of the Third and Fourth Circuits is consistent with our pre-<u>Dickerson</u> application of the exclusionary rule under <u>Miranda</u>, our understanding of the dual rationales behind <u>Miranda</u>, the <u>Dickerson</u> Court's ongoing endorsement of the refusal to extend the fruits doctrine in <u>Elstad</u> and <u>Tucker</u>, and the lack of authority from the Supreme Court instructing the use of different methods of treatment for different forms of derivative evidence. Regarding the balancing test created by the First Circuit, we do not find authority to support a test which incorporates the state of mind of the offending officer into the analysis of admissibility. That is not to say, however, that an officer's actions are irrelevant. They remain relevant to the extent the officer's actions serve as a factor in the creation of the interrogation environment which, if sufficiently coercive to make a defendant's

-18-

confession actually involuntary, will prevent the admission of derivative evidence even under the voluntariness standard of Elstad and Tucker.

Regarding Patane, we find at least two compelling reasons not to join the Tenth Circuit in its extension of the fruits doctrine. First, we find the Patane court's reliance on that portion of Elstad which discussed volition – including the discussion in footnote 29 of Justice Brennan's dissent – contrary to our understanding of the inherent reliability of physical evidence. Whereas evidence in the form of a statement is unique in the sense that a person's volition always separates and insulates such evidence, to some extent, from events precedent, we do not understand how the fact of such insulation serves to enhance the reliability of a statement vis-a-vis physical evidence. Further, unlike the Tenth Circuit, we do not read the Elstad majority's reference to volition as necessary for the Court's holding, nor do we read Justice Brennan's dissent as controlling. Accordingly, although the Court in Elstad referred to the unique nature of testimony, we do not read Elstad as turning on that characterization.

Second, we simply find it necessary to accord greater deference to Dickerson's preservation of the ongoing distinction in application of the exclusionary rule under the Fourth and Fifth Amendments than did the Tenth Circuit in Patane. Accordingly, we do not read Dickerson as having so dramatically changed the landscape under Miranda as to limit by inference the established exceptions to Miranda. The Court in Dickerson faced a challenging task. In preserving the protections of Miranda against Congress's attempted imposition of a return to the pre-Miranda voluntariness standard, the Court did not address Elstad for the purpose of cabining an established exception, but merely to address anticipated, future attacks by explaining language that appeared contrary to the Miranda-is-constitutional pronouncement of Dickerson. Given the fact that the actual holding of Dickerson was unrelated to the rule of Elstad, and that the discussion of Elstad was more an attempt to reconcile, rather than upset, established exceptions, we feel compelled not to interpret Dickerson as having been intended to narrowly limit the established exceptions.

-19-

In summary, we join the Third and Fourth Circuits in their post-<u>Dickerson</u> interpretations of <u>Elstad</u> which mandate application of a voluntariness standard to determine the admissibility of evidence derived from a <u>Miranda</u> violation without discrimination in application of the rule to subsequent statements, witness testimony, or physical evidence. In doing so, we refuse to interpret <u>Dickerson</u> as having altered the exclusionary rule in a manner that would effectively permit the government to compel a defendant to testify against himself under <u>Elstad</u> and yet not permit the admission of derivative physical evidence. Such an outcome – greater protection against the use of physical evidence than testimony – would not be intuitively consistent with the fact that <u>Miranda</u> protects the Self-Incrimination Clause of the Fifth Amendment rather than a defendant's Fourth Amendment rights. Further, such a distinction would not be intuitively consistent with the government's inability to compel testimony, but ability to compel the disclosure of non-testimonial evidence. <u>See</u> <u>Pennsylvania v. Muniz</u>, 496 U.S. 582, 590 (1990) ("both federal and state courts have usually held that [the Fifth Amendment's Self Incrimination Clause] offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture.") (quoting <u>Schmerber v. California</u>, 384 U.S. 757, 764 (1966)) .

IV.

Because we find the derivative statement and physical evidence admissible, we are not strictly bound to rule on the remaining issue – the inevitable discovery of the physical evidence. We address this issue, however, because the Court granted certiorari in <u>Patane</u>, 304 F.3d 1013, and if the Court's ruling affects our present decision, we will not have served the interests of judicial economy by having failed to rule on the issue of inevitable discovery at this time.

The test for inevitable discovery as set forth in <u>Nix v. Williams</u>, 467 U.S. 431 (1984) includes two elements. First, there must be an ongoing line of investigation

that is distinct from the impermissible or unlawful technique. Id. at 444. Here it is undisputed that this first element is satisfied. The search was being conducted pursuant to a valid and unchallenged search warrant of sufficient scope to allow the officers to search the location where the drugs were actually found. Second, there must be a showing of a reasonable probability that the permissible line of investigation would have led to the independent discovery of the evidence. Id. The required standard of proof on this evidentiary issue is a simple preponderance of the evidence, not proof beyond a reasonable doubt. United States v. Feldhacker, 849 F.2d 293, 296 (8th Cir. 1988); United States v. Conner, 127 F.3d 663, 667 (8th Cir. 1997). Here, we agree with the district court that the government failed to make the required showing.

We have noted that in applying Nix, it is important to focus not on what the officers actually did after unlawfully recovering evidence, but on what the officers were reasonably likely to have done had the unlawful recovery not occurred. Feldhacker, 849 F.2d at 296 ("The difficulty with appellants' approach to the inevitable-discovery rule is that it mistakenly focuses on what investigators actually did after the unlawful recovery, rather than what they would have done in the absence of such an illegal disclosure. This inquiry necessarily entails reasoning about hypothetical circumstances contrary to fact."). Accordingly, it is important to note that we do not discount the availability of the drug dog simply because the officers did not actually call the drug dog or discount the searching ability of the officers simply because they were not forced to display that ability by actually uncovering the hidden compartment.

Nevertheless, in comparing the facts of the present case to the facts of Nix, we concur in the judgment of the district court that the government failed to demonstrate the requisite reasonable probability of discovery. The defendant in Nix confessed the location of a child-victim's body to an officer while in route between Davenport and Des Moines, Iowa. The location was about 2 ½ miles away from an area that search teams had divided into grids and were moving through in a methodical fashion. The

Court in <u>Nix</u> ruled that had the defendant not confessed the location, there was a reasonable probability that the search team would have moved into the next county in the direction of the body to search the location where the body was ultimately found. Adding to the reasonable probability of discovery in <u>Nix</u> was the fact that the search leader had instructed searchers to look in ditches and culverts, that the body was near a culvert, and that the search leader testified that he would have moved into the area where the body was found.

In the present case, there was no such testimony concerning specific details of the situs of the search or the intentions or definite plans of the searchers. As noted above, the lead officer did not claim to have a specific intention to call the dog that happened to be available. He merely described a general search method. Further, he could not identify the dog or its controller by name. We will not infer a reasonable probability that a dog would have been called and that the dog would have discovered drugs when the government cannot identify the dog and the dog's presence was a fortuitous coincidence rather than a planned aspect of the search. Regarding the likelihood that officers would have uncovered the secret panel without the assistance of a dog, we again find a lack of specific details to support a conclusion that discovery was reasonably probable.

Regarding the currency discovered in a coat pocket, we agree with the district court that there was a reasonable probability of discovery. Officers had a valid warrant sufficient in scope to permit the checking of coat pockets, and there is more than a reasonable probability that execution of the warrant would have entailed looking through pockets.

For all of the reasons set forth herein, we reverse the district court's suppression of physical evidence and partial suppression of the post-warning statement and remand for further proceedings consistent with this opinion.

HEANEY, Circuit Judge, dissenting.

The majority obscures the real issue in this case: May the police violate a person's constitutional rights, and then exploit that violation to obtain evidence that they otherwise would not have secured? Miranda v. Arizona, 384 U.S. 436 (1966), and related cases, clearly mandate that this evidence must be excluded. Both the magistrate judge[4] and the district court[5] correctly determined that the cocaine seized by the police would not have been discovered absent the violation of Angel Benito Villalba-Alvarado's constitutional rights. Since the evidence seized and a portion of Villalba-Alvarado's subsequent confession flowed from the constitutional violation, they must be suppressed. I would thus affirm the district court.

I.

The essential facts are stated in the majority opinion. I believe it important, however, to underscore the following details. The execution of the warrant appears to have been directed by Thomas Peterson, a seven year veteran of the Minneapolis police force, the past three and a half of which he was assigned to the narcotics unit. In the moments before the search was executed, officers observed the defendant driving near his residence. By order of Officer Peterson, Villalba-Alvarado's car was stopped five blocks from his apartment. He was removed from the car by uniformed Minneapolis Police Officer Blade and handcuffed. Officer Peterson arrived on the scene and informed Villalba-Alvarado that he had a warrant to search Villalba-Alvarado, his car, and his home. Again, at the direction of Officer Peterson, Officer Blade transported Villalba-Alvarado to his residence in the back of a Minneapolis squad car.

---

[4]The Honorable Susan Richard Nelson, United States Magistrate Judge for the District of Minnesota.

[5]The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

Once Villalba-Alvarado was at his apartment, Officer Peterson took custody of him from Officer Blade, switching handcuffs so that Villalba-Alvarado was restrained with Officer Peterson's set. Next, Officer Peterson brought Villalba-Alvarado toward his apartment, walking him up the stairs to the unit. At this point, Officer Peterson told Villalba-Alvarado for a second time that he had a warrant and would be performing a detailed search of Villalba-Alvarado, his car, and his apartment for drugs and money. Neither Peterson, nor any other officer, administered Villalba-Alvarado his Miranda warnings.

In response to Officer Peterson, Villalba-Alvarado, still handcuffed, directed Officer Peterson to a hidden compartment in a small hutch. Inside the compartment was approximately one-half pound of cocaine and a scale. Villalba-Alvarado also told Peterson that there was money in the interior pocket of a suit jacket hanging up in a closet. Officers searched and found $3,360, a portion of which was pre-recorded buy money from an earlier sting.

After the cocaine and money were seized, Officer Peterson asked Villalba-Alvarado if he could give the officers any explanation for the contraband. Because Villalba-Alvarado wished to speak in Spanish, he was placed in the custody of an officer who could accommodate him. Villalba-Alvarado was then transported to jail, where for the first time he was informed of his Miranda rights. He waived his rights and gave an incriminating statement, the first portion of which related to the seized items.

Villalba-Alvarado was promptly charged with possession with intent to distribute cocaine.[6] He moved to suppress the evidence seized and statements taken from him, because they were obtained as a direct result of a violation of his Miranda rights. The government responded by arguing that the so-called "fruit of the poisonous tree" doctrine upon which the defendant relied had no application to

_____

[6] 21 U.S.C. § 841(a)(1), 841(b)(1)(B).

-24-

Miranda violations, and thus the evidence and statements were admissible. The district court referred the matter to a magistrate judge, who recommended suppressing the cocaine, scale, and Villalba-Alvarado's statement.[7] After conducting a de novo review of the record, the district court agreed that the cocaine and scale should be suppressed, but limited suppression of Villalba-Alvarado's statement to only those portions that concerned the illegally-obtained evidence. Thereafter, the government filed a document entitled a "Motion to Reconsider" the court's suppression order, arguing again that the derivative evidence should be admitted. The district court denied the motion, and this interlocutory appeal followed.

I will first address the issue of whether the district court correctly suppressed the physical evidence that flowed from the Miranda violation, and then consider whether Villalba-Alvarado's second statement must be suppressed. My reasons for addressing the issues in this order are twofold: 1) this order follows the chronology of events, and 2) the fact that the physical evidence must be suppressed is the impetus for suppressing a portion of Villalba-Alvarado's statement.

II.

The majority suggests that United States v. Wiley, 997 F.2d 378 (8th Cir. 1993),[8] supports its conclusion that physical evidence derived from a Miranda violation should not be suppressed. I cannot agree. Since Wiley was decided, the Supreme Court has made clear that a Miranda violation is a constitutional violation, and must be treated accordingly. See Dickerson v. United States, 530 U.S. 428

---

[7]The government did not seek to admit any of the statements Villalba-Alvarado made during the execution of the search warrant, conceding that they were taken in violation of his Miranda rights. The statement in question is the one given by Villalba-Alvarado at the jail following his arrest.

[8]Wiley was subsequently overruled on other grounds. See United States v. Bieri, 21 F.3d 819, 823 (1994).

(2000). Moreover, because <u>Miranda</u> was primarily concerned with deterring police intrusions on the constitutional rights of suspects, it significantly weakens <u>Miranda</u> to suggest that its exclusionary rule should be limited to only the initial unwarned statement. Lastly, despite the majority's claim that the exclusionary rule is applied differently in the Fourth and Fifth Amendment contexts, both the Fourth and Fifth Amendments have historically supported the use of the "fruit of the poisonous tree" doctrine.

### A.

In <u>United States v. Wiley</u>, 997 F.2d 378 (8th Cir. 1993), the defendant was taken into custody as part of an investigation of a drug conspiracy. The police brought him to a motel room and asked him to provide information that would assist their investigation. At no time was the defendant given his <u>Miranda</u> warnings. As a result of the interrogation, Wiley gave a statement implicating himself in the drug trade and led officers to incriminating physical evidence. He moved to suppress the physical evidence, but the district court denied his motion. In affirming the decision, our court turned for guidance to <u>Oregon v. Elstad</u>, 470 U.S. 298 (1985). We noted that in <u>Elstad</u>, the Supreme Court "rejected a fruit-of-the-poisonous-tree argument and held that a second confession, given after a proper <u>Miranda</u> warning, was admissible, although it came on the heels of an unwarned statement." <u>Wiley</u>, 997 F.2d at 383. We reasoned "[b]y analogy to <u>Elstad</u>," that physical evidence obtained as a result of a <u>Miranda</u> violation should be treated no differently.[9] <u>Id.</u>

---

[9]<u>Elstad</u> was limited to circumstances involving subsequent statements, not the subsequent seizure of evidence. <u>Elstad</u>, 470 U.S. at 347 n.29 (Brennan, J., dissenting) ("[T]oday's opinion surely ought not be read as also foreclosing application of the traditional derivative-evidence presumption to physical evidence obtained as a proximate result of a Miranda violation."). These are two different types of evidence that do not lend themselves well to a parallel analysis. <u>See id.</u> (citing majority opinion at 308-09). The <u>Elstad</u> Court in fact recognized as much: while a second confession following proper <u>Miranda</u> warnings may be admissible because "a careful and

-26-

Were it not for the recent Supreme Court decision in <u>Dickerson v. United States</u>, 530 U.S. 428 (2000), we would be bound by <u>Wiley</u>. Until <u>Dickerson</u>, many believed that <u>Miranda</u> was merely a type of constitutional prophylaxis–not itself constitutional, but rather a medium to protect the rights of the accused. The Supreme Court appeared to rely on this principle in its decision in <u>Elstad</u>. <u>Elstad</u>, 470 U.S. at 305 (stating that "[t]he prophylactic Miranda warnings therefore are not themselves rights protected by the Constitution" (quotation omitted)). In <u>Dickerson</u>, however, the Supreme Court clarified that the <u>Miranda</u> decision was itself constitutional in nature, and not merely prophylactic. <u>Dickerson</u>, 530 U.S. at 432 (stating that <u>Miranda</u> was a "constitutional decision of this court").

<u>Wiley</u> relied heavily on the Supreme Court's pre-<u>Dickerson</u> jurisprudence, particularly <u>Elstad</u>, to establish that derivative evidence was beyond the scope of <u>Miranda</u>'s exclusionary rule.[10] <u>See, e.g.</u>, <u>Wiley</u>, 997 F.2d at 383 (citing <u>Elstad</u> for the proposition that the "Fifth Amendment . . . prohibits only the use of compelled testimony"). Since the rationale behind <u>Elstad</u> is no longer sound, it follows that <u>Wiley</u>–a case based on an *extension* of <u>Elstad</u>'s flawed analysis–cannot remain intact.

B.

Since <u>Dickerson</u>, the circuits have split on the issue of whether physical evidence derived from a <u>Miranda</u> violation must be suppressed. <u>Compare</u> <u>United</u>

---

thorough administration of Miranda warnings serves to cure the condition that rendered the unwarned statement inadmissible," <u>id.</u> at 310-11, the Court could not employ the same "curing" analysis to derivative physical evidence. Unlike a subsequent confession, which relies in some part on the willingness of the confessor to give the statement, physical evidence derived from an improper interrogation remains just that–the direct product of the improper interrogation.

[10]<u>Dickerson</u> reaffirmed that <u>Elstad</u>'s holding remains good law, even if reached through a mistaken analysis. <u>Dickerson</u>, 530 U.S. at 441.

States v. Sterling, 283 F.3d 216, 219 (4th Cir. 2002) (refusing, in a post-Dickerson case, to apply the "fruit of the poisonous tree" doctrine to evidence obtained as result of a Miranda violation), and United States v. DeSumma, 272 F.3d 176, 180 (3d Cir. 2001) (same), with United States v. Patane, 304 F.3d 1013, 1023 (10th Cir. 2002) (holding Miranda's deterrent purpose will only be effectuated through application of "fruit of poisonous tree" doctrine to derivative evidence of Miranda violations) cert. granted, 123 S.Ct. 1788 (2003), and United States v. Faulkingham, 295 F.3d 85, 93-94 (1st Cir. 2002) (recognizing "fruit of the poisonous tree" doctrine may apply where officers deliberately fail to give accused required Miranda warnings).  After carefully considering the differing approaches and results of the circuits, it is the Tenth Circuit's decision in Patane, in my view, that is the most faithful to the Constitution and will best protect the rights of the accused.

The Patane court first considered whether a pre-Dickerson decision of the circuit that admitted physical evidence derived from Miranda violations, was still viable.  Because that decision, like ours in Wiley, rested heavily on the faulty premise that a Miranda violation is not a Fifth Amendment violation, the court concluded that it was no longer valid.  Patane, 304 F.3d at 1023.

Because the Tenth Circuit had the benefit of the decisions of the First, Third, and Fourth Circuits, it next considered the approaches of these circuits, in an effort to determine how to best effectuate Miranda's constitutional principles.  It recognized that the Third and Fourth Circuits' wholesale rejection of the "fruit of the poisonous tree" doctrine served to undermine the deterrent effect of Miranda's exclusionary rule.  Patane, 304 F.3d at 1026.[11]  It then reviewed the approach taken by the First

_____

[11]In DeSumma, the Third Circuit opined that suppressing the fruits of a Miranda violation "would be inconsistent with deterring improper police conduct" because "[n]o constitutional violation occurs" as the result of a failure to administer warnings.  DeSumma, 272 F.3d at 180.  This reasoning turns a blind eye to Dickerson's holding, and instead continues under the mistaken belief that technical Miranda violations are of no import.  Dickerson makes clear that Miranda violations

-28-

Circuit in <u>United States v. Faulkingham</u>, 295 F.3d 85 (1st Cir. 2002). While the <u>Patane</u> court agreed with the First Circuit that the "fruit of the poisonous tree" doctrine applies to <u>Miranda</u> violations, it could not accept the artificial distinction between negligent and intentional violations suggested by the First Circuit. <u>Patane</u>, 304 F.3d at 1028. It reasoned, correctly in my view, that the "personal right to be free of government invasions of the privilege against self-incrimination is violated just as surely by a negligent failure to administer <u>Miranda</u> warnings as a deliberate failure." <u>Id.</u>

Deterrence served as the motivating principle for the Supreme Court's decision in <u>Miranda</u>, and it remains so today: "[F]or more than thirty years, the dominant rationale for excluding coerced confessions has been the Court's disapproval of and attempts to discourage the offensive police methods that produce such confessions, regardless of their reliability." Yale Kamisar, <u>On the "Fruits" of Miranda Violations, Coerced Confessions, and Compelled Testimony</u>, 93 Mich. L. Rev. 929, 1005 (1995). It is this same principle that has motivated the Court to extend the exclusionary rule to evidence derived from the initial constitutional violation, such that "the prosecution is not to be put in a better position than it would have been in if no

---

are constitutional violations. 530 U.S. at 432. It does not comport with my understanding of constitutional law to hold that an officer acts properly when he violates the constitutional rights of the accused. Rather, this is precisely the type of improper governmental conduct that the exclusionary rule seeks to curtail. <u>Nix v. Williams</u>, 467 U.S. 431, 442-43 (1984).

While the Fourth Circuit's decision in <u>Sterling</u>, 283 F.3d at 219, recognized that the failure to deliver <u>Miranda</u> warnings was itself a constitutional violation, that court nonetheless reasoned that <u>Dickerson</u>'s "reference to and reaffirmation of <u>Miranda</u>'s progeny indicates that the established exceptions, like those in [<u>Michigan v. Tucker</u>, 417 U.S. 433 (1974)] and <u>Elstad</u>, survive." <u>Id.</u> While <u>Tucker</u> and <u>Elstad</u> were not overruled by <u>Dickerson</u>, neither of those cases involved physical evidence. To reach the result it did, the Fourth Circuit was forced to extend the analysis of inapposite Supreme Court cases.

illegality had transpired." Williams, 467 U.S. at 443. "The core rationale consistently advanced by this Court for extending the exclusionary rule to evidence that is the fruit of unlawful police conduct has been that this admittedly drastic and socially costly course is needed to deter police from violations of constitutional and statutory protections."[12] Id. at 442-43.

Failing to extend the exclusionary rule to derivative evidence may create incentives for officers to violate the rights of the accused in order to secure convictions. Steven D. Clymer, Are Police Free To Disregard *Miranda*?, 112 Yale L.J. 447, 502-03 (2002). In the words of Professor Kamisar, "is disapproval or discouragement of objectionable police methods likely to be taken seriously by law enforcement officials or the public if physical evidence derived indirectly from such methods is used to convict a defendant?" Kamisar, supra, at 941. Recently, studies have suggested that law enforcement officers are often not following the tenets of Miranda. See Richard A. Leo, Questioning the Relevance of *Miranda* in the Twenty-First Century, 99 Mich. L. Rev. 1000, 1010 (2001) (noting that "in some jurisdictions police are systematically trained to violate Miranda by questioning 'outside Miranda'"); Charles D. Weisselberg, In the Stationhouse After *Dickerson*, 99 Mich. L. Rev. 1121, 1123-54 (2001) (detailing the trend in California for officers to question suspects without regard to Miranda warnings or suspects' invocation of same). Scholars suggest that one reason for this trend is that the government has recognized that often the violation of Miranda will yield stronger evidence than compliance with the rule. Clymer, supra, at 502-03 ("If the Court interpreted Miranda to require a robust exclusionary rule, similar to those that it applies to immunized testimony and coerced confessions, it would promote obedience to the Miranda requirements." (footnotes omitted)). In light of the purpose of the exclusionary rule

---

[12]While deterrence is the primary guiding principle of the exclusionary rule, "it is not deterrence alone that warrants the exclusion of evidence illegally obtained–it is 'the imperative of judicial integrity.'" Harrison v. United States, 392 U.S. 219, 224 n.10 (quoting Elkins v. United States, 364 U.S. 206, 222 (1960)).

and <u>Miranda</u>'s constitutional status, it is difficult to fathom not extending the exclusionary rule to evidence derived from <u>Miranda</u> violations.

## C.

Lastly, it bears brief mention that, despite intimations in <u>Sterling</u>, 283 F.3d at 219, and <u>DeSumma</u>, 272 F.3d at 180, to the contrary, the "fruit of the poisonous tree" doctrine is not something foreign to the Fifth Amendment. While <u>Dickerson</u> acknowledged that the exclusionary rule has a different *application* in Fourth Amendment cases than in Fifth Amendment cases, <u>Dickerson</u>, 530 U.S. at 441, the Court has never suggested that the "fruit of the poisonous tree" doctrine is confined to the Fourth Amendment, see <u>Brown v. Illinois</u>, 422 U.S. 590, 601 (1975) ("The exclusionary rule, however, when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth. It is directed at all unlawful searches and seizures, and not merely those that happen to produce incriminating material or testimony as fruits."). The "Court has applied the ["fruit of the poisonous tree"] doctrine where the violations were of the Sixth Amendment, as well as of the Fifth Amendment." <u>Williams</u>, 467 U.S. at 442 (citation and footnote omitted); <u>accord</u> <u>Patane</u>, 304 F.3d at 1021 n.4 ("Indeed, in <u>Miranda</u> itself the Court stated that 'unless and until such warnings and waiver are demonstrated by the prosecution at trial, *no evidence obtained as a result of interrogation* can be used against him.'" (quoting <u>Miranda</u>, 384 U.S. at 454 (emphasis in <u>Patane</u>))). For instance, in <u>Kastigar v. United States</u>, 406 U.S. 441 (1972), the Court held that a federal immunity statute must protect the witness from prosecution based not only on the use of that witness's actual words, but also based on evidence derived from his statement in order to comply with the Fifth Amendment. <u>Id.</u> at 453. The Court recognized that immunizing compelled testimony, and evidence derived from that testimony, was coextensive with the privilege against self-incrimination, for it left the witness and the government in the same position as if the witness had claimed the privilege. <u>Id.</u> at 458-59. In other words, the privilege against self-incrimination

extended not only to direct statements, but to any fruits of those statements that could be used to incriminate the defendant.

Certainly, the hands of law enforcement will not be tied by application of the exclusionary rule in a manner faithful to Miranda. Rather, the rule will merely place the parties in the position they would have been absent the constitutional violation. Accord Williams, 467 U.S. at 442-43. If law enforcement can show by a preponderance of the evidence that an exception to the exclusionary rule applies, the evidence should be admitted. Id. at 444. But here no such showing has been made, and I am left with the firm conviction that the cocaine and scale were properly suppressed by the district court.

III.

Having established that the cocaine and scale were illegally obtained from Villalba-Alvarado's residence, the question of what effect to give his properly warned statement remains. Because a portion of this statement concerns the cocaine and scale, I would suppress that portion of his statement as a further fruit of the initial illegality. Cf. Harrison v. United States, 392 U.S. 219, 222 (1968).[13]

The majority references our recent opinion in United States v. Fellers, 285 F.3d 721 (8th Cir. 2002), cert. granted, 123 S.Ct. 1480 (2003), for the proposition that where an initial statement is inadmissible because of a Miranda violation, a subsequent statement may be admissible if it was preceded by a proper Miranda warning and waiver. I agree that Fellers stands for this principle, but do not find

---

[13]As to the remainder of Villalba-Alvarado's statement, no appeal has been taken from the district court's order allowing its use at trial. Thus, it is not for us to decide at this time whether this portion of his statement should be admitted. It bears mention, however, that the holding in Elstad has not yet been overruled and has addressed a similar issue.

Fellers instructive in the circumstance presented here. In Fellers, the defendant made an unwarned statement, then later made another statement following the administration of Miranda warnings. He argued that his second statement was tainted by the earlier, improperly elicited statement, and that the taint was not removed by the simple recitation of his Miranda rights before he gave his second statement. Recognizing that the defendant's argument was foreclosed by Elstad v. Oregon, 470 U.S. 298 (1985), we denied relief. Fellers, 285 F.3d at 724.

A read of both cases reveals that Elstad is factually indistinguishable from Fellers. In both cases, officers elicited statements from the defendants without properly administering Miranda warnings. Elstad, 470 U.S. at 301; Fellers, 285 F.3d at 723. Both defendants made statements in response to this questioning, and then made subsequent statements following Miranda warnings. Elstad, 470 U.S. at 301-02; Fellers, 285 F.3d at 724. Neither case involved the issue presented here: Whether, when a subsequent statement concerns illegally obtained evidence, that statement can be admitted.

Elstad itself recognized that the government must take steps to purge the taint of the initial unwarned statement. Elstad, 470 U.S. at 310-11. As discussed in detail above, however, there is a difference between unwarned statements and physical evidence derived from those statements. Thus, while the simple recitation of a Miranda warning may be sufficient to "cure" a second statement from the illegality of an earlier one, that same rule does not apply to statements that directly relate to illegally obtained evidence. In Fahy v. Connecticut, 375 U.S. 85, 90-91 (1963), the Supreme Court clearly indicated that where a subsequent confession was induced by illegally seized evidence, the confession itself may be suppressed. It noted that this position was faithful to the longstanding rule that the "essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all." Id. at 91 (quoting Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392 (1920)); accord Harrison v. United States, 392 U.S. 219, 222 (1968) (holding that where

-33-

defendant's trial testimony was induced by illegally obtained confessions, admission of such testimony was error). The portion of the statement suppressed by the district court dealt directly with the cocaine and scale, both of which were obtained by violation of Villalba-Alvarado's <u>Miranda</u> rights. The district court's approach was true to relevant Supreme Court precedent, and should not be reversed.

## IV.

The physical evidence in this case was obtained in violation of Villalba-Alvarado's constitutional rights. The district court recognized as much, and properly suppressed both that evidence and the portion of Villalba-Alvarado's statement that concerned that evidence. I would affirm the district court, and thus respectfully dissent.

_____